Mark E. ROBBINS, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–02–00519–CR.

Court of Appeals of Texas,
El Paso.

Aug. 12, 2004.

Rehearing Overruled Sept. 1, 2004.

Matthew DeKoatz, El Paso, for Appellant.

Jaime E. Esparza, District Atty., El Paso, for State.

Before Panel No. 1 LARSEN, McCLURE, and CHEW, JJ.

## OPINION

SUSAN LARSEN, Justice.

A jury convicted Mark Robbins of seven counts of attempted capital murder and two counts of aggravated assault on a public servant. The jury sentenced him to twenty years' imprisonment for attempted capital murder and fifteen years' imprisonment for aggravated assault on a public servant. On appeal, Robbins argues that the evidence was legally insufficient and that the prosecutor made an improper jury argument. Finding no merit to these contentions, we affirm.

### FACTUAL BACKGROUND

Two El Paso Police Department Officers were dispatched to Robbins's house based on a report of an altercation between Robbins and his wife. The officers were informed that Robbins had worked for the El Paso County Sheriff's Office, that he may have weapons in the house, and that he might be suicidal. When the officers arrived, they asked the dispatcher to call the house. The dispatcher called several times without getting an answer. One of the officers knocked on the door and got no response. They noticed that the house had some broken windows. They also saw Robbins's mother down the street. She was "hysterical" and had heard shots coming from Robbins's house. One of the officers testified that he spoke over the phone with Robbins's wife, who told him that Robbins had shot at her using a bow and arrow and that she had left the house.[1] One of the officers also spoke on the phone with Robbins. Robbins told the officer that he did not intend to come out of the house because he believed he would be arrested for aggravated assault or placed in protective custody for mental problems.

The officers' supervisor arrived and spoke with Robbins over the phone. Robbins told him that "things" were "going to get ugly." A decision was made to call out the Special Weapons and Tactics Unit (SWAT). Eventually, as many as sixty officers arrived, and a standoff ensued until Robbins finally surrendered six-to-eight hours after SWAT arrived. As discussed in detail below, the State presented evidence that Robbins shot at several of the officers during the course of the standoff.

### SUFFICIENCY OF THE EVIDENCE

The jury convicted Robbins of the attempted capital murder of Officers Steve Moreland, Adrian Ruiz, John Cataldi, Bernandino Martinez, Sergio Lopez, Ken Law, and Steven Smith, and of the aggravated assault of Officers Jose Reveles and Carlos Contreras. In his first issue, Robbins argues that the evidence is legally insufficient to establish that he intended to kill or harm any of these officers.

### Standard of Review

In reviewing the legal sufficiency of the evidence, we must consider all the evidence in the light most favorable to the verdict to determine whether a rational jury could have found the essential elements of the offense beyond a reasonable

---

1. A negotiator who arrived at the scene later testified that Robbins's wife also told him that Robbins had used the bow and arrow against her. Testifying during the punishment phase, the wife denied that she gave any of the officers this information.

doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Wallace v. State*, 52 S.W.3d 231, 234 (Tex.App.-El Paso 2001, no pet.). The jury, not the reviewing court, has the power to weigh the evidence and to resolve conflicts in the evidence. *Wallace*, 52 S.W.3d at 234. In reviewing the legal sufficiency of the evidence to prove intent, we must presume that the jury resolved conflicting inferences from the evidence in favor of the verdict, and we must defer to that resolution. *Hullaby v. State*, 911 S.W.2d 921, 929 (Tex.App.-Fort Worth 1995, pet. ref'd).

### *The Attempted Capital Murder Counts*

■ To establish that a defendant is guilty of attempted capital murder, the State must prove that the defendant had the specific intent to kill. *See* TEX. PEN. CODE ANN. §§ 15.01(a), 19.02(b)(1) (Vernon 2003), § 19.03(a)(1) (Vernon Supp.2004); *Flanagan v. State*, 675 S.W.2d 734, 741 (Tex.Crim.App.1984) (op. on reh'g); *Tubbs v. State*, 57 S.W.3d 519, 522–23 (Tex.App.-Waco 2001, pet. ref'd). Whether the defendant had the intent to kill is a question of fact for the jury to determine. *Brown v. State*, 122 S.W.3d 794, 800 (Tex.Crim. App.2003), *cert. denied*, —— U.S. ——, 124 S.Ct. 1678, 158 L.Ed.2d 359 (2004); *Hall v. State*, 418 S.W.2d 810, 812 (Tex.Crim.App. 1967). In determining whether the State has proven the intent to kill, the jury may use its collective common sense and may apply common knowledge and experience. *See Rodriguez v. State*, 90 S.W.3d 340, 355 (Tex.App.-El Paso 2001, pet. ref'd). The jury may infer the intent to kill from any evidence that it believes proves the existence of that intent. *Brown*, 122 S.W.3d at 800. For example, the jury may infer the intent to kill from the defendant's words or conduct. *Hall*, 418 S.W.2d at 812; *see also Wallace*, 52 S.W.3d at 234. The jury may also infer the intent to kill from the defen-

dant's use of a deadly weapon, such as a gun, unless it would be unreasonable to infer that death or serious bodily injury could result from the use of the weapon. *Brown*, 122 S.W.3d at 800; *Jones v. State*, 944 S.W.2d 642, 647 (Tex.Crim.App.1996); *see also* TEX. PEN.CODE ANN. § 1.07(a)(17)(A) (Vernon Supp.2004).

With these principles in mind, we turn to the record to determine whether the evidence is legally sufficient to establish that Robbins had the specific intent to kill the officers.

### Officer Moreland

Officer Moreland arrived on the scene after the first officers had arrived but before SWAT arrived. He climbed on the roof of a house near Robbins's house. While on the roof, he heard a loud pop, which he identified from experience as a shot from a high-powered rifle. Other officers had already informed Moreland that Robbins had high-powered weapons. He also heard the sound and felt the breeze from a bullet "whizzing" by him at a distance of no more than five feet. He called out over the police radio that shots were fired in his direction. Moreland testified that he was the only person in the area and that he believed the shot was aimed at him. He was only seventy-five to eighty yards from Robbins's house. According to Moreland, it is "not very hard" to shoot someone from that distance. Moreland acknowledged that it was dark when the shot was fired and that it would have been hard to see his head from Robbins's house.

### Officer Ruiz

SWAT Officer Ruiz was stationed on the roof of a shed in Robbins's backyard. Robbins walked out of the house into the yard and saw Ruiz and another officer. He went back into the house and turned

on floodlights in the backyard. A SWAT negotiator, Officer Valencia, testified that at one point during the standoff, Robbins said that he was focusing his sights on an officer who was on the shed by a tree. After passing this information along, Valencia heard over the radio that a shot had been fired. Several officers, including Ruiz, testified that they heard over the police radio that Robbins had told the negotiator that he saw someone in the trees behind his house and that he was going to shoot him. Less than a minute later, a shot was fired. Officer Martinez testified that he heard yelling coming from inside the house and saw a muzzle flash coming from the back of the house.[2]

Ruiz testified that the muzzle flash was pointed at him. He also testified that the bullet could have passed within a foot of him and was at most ten feet from him. Ruiz stated that he had no doubt that Robbins was shooting at him. He acknowledged, however, that he only called out over the police radio that he saw a muzzle flash in his direction; he did not say that Robbins shot at him.

### Officer Cataldi

Officer Cataldi served as the primary negotiator on the public address (PA) team during the incident. The PA team was located behind the trunk of a patrol vehicle pointed towards Robbins's house. The lights of the vehicle were on so that Robbins could not see the PA team. Valencia, who was negotiating with Robbins over the phone, testified that Robbins asked him who "John" was. When Valencia told him that John Cataldi was another negotiator, Robbins told Valencia to tell the PA team to "shut up" or he was going to start shooting. Several officers testified that they heard Robbins shout something like "John, where are you?" He then stuck his hand out of one of the windows in his house and pointed a gun in the direction of the PA team, including Cataldi. Robbins held the gun in a level position and pointed it straight ahead, not up or down. Seconds later, there was a muzzle flash at the window where Robbins had been standing, and the PA team announced over the radio that a shot had been fired in the team's direction. Martinez had "no doubt" that the gun was leveled directly at the PA team. Cataldi's loud speaker was directly behind the lights of the patrol vehicle, and Robbins shot in the direction of Cataldi's voice.

Cataldi testified that he heard over the radio that Robbins was taking aim at the PA team. He then heard a very loud gunshot. Cataldi did not know how close the bullet came to him.

### Officers Martinez, Lopez, Law, and Smith

Officer Reveles, a SWAT sergeant, led a group of officers that approached Robbins's house using an armored rescue vehicle (ARV). Officer Lopez drove the ARV, and Officer Martinez was stationed at a turret on the top of the ARV. Officers Smith, Contreras, and Law were stationed behind the ARV once it stopped near Robbins's driveway. At that point, the ARV was about fifty feet from the front of Robbins's house. The ARV had a police badge painted on it, along with the words "police" and "rescue." The vests the officers were wearing had a police emblem on the front and back.

In an early conversation with Officer Valencia, the telephone negotiator, Robbins asked Valencia if he had ever seen what armor-piercing bullets can do to a vest. In a later conversation, Robbins said that he had C–4 explosives, gunpowder,

---

**2.** A "muzzle flash" is the flash of light that occurs when a gun is discharged.

and a gas mask, and that if officers entered his house he was going to take as many of them as he could out with him.

Robbins came out of his house during the standoff and, according to the officers, appeared to be trying to determine the locations of the officers. At one point while he was outside of the house, Robbins yelled in the direction of the officers at the ARV, inviting them to play "quick draw" and demanding that they get out of his driveway. He immediately went inside the house and began firing in the direction of the ARV. Although the lights from the patrol vehicle would have blinded Robbins when he looked towards his front yard, Martinez testified that the lights would not have had much effect on Robbins's ability to see the ARV. Smith testified that he saw Robbins level his gun towards the ARV. Reveles indicated that all the officers deployed at the ARV were in the line of fire.

Reveles also testified that one of the shots hit the ARV just inches below the turret where Martinez was and that if the shot had been just a few inches higher, it could have hit Martinez on the vulnerable part of his bullet-proof vest. Martinez testified that he saw a "perfect circle muzzle flash" coming towards him, and that the shot came within two feet of hitting him. He also testified that there was no doubt in his mind that Robbins was trying to kill him.

Lopez, the driver of the ARV, testified that based on the muzzle flashes that he saw and the fact that shots hit the ARV, he believed that Robbins was trying to kill the officers in and around the ARV. Reveles testified that the armor on the ARV is "pretty effective," but that "[w]e have learned recently that ... some rifle rounds, especially armor-piercing ammunition will penetrate that armor." He also stated that the glass on the ARV "will take a certain amount of hits, but after a while, if it takes too many hits, then it will be compromised and rounds can penetrate it." Lopez also testified that bullets could penetrate the ARV. When defense counsel asked him whether he was "trying to leave the impression with the ... jury that you're concerned about bullets coming through the ARV," Lopez answered, "Yes, sir, I am." He admitted, however, that he was not aware of any incident in which bullets had penetrated the ARV. He explained, "I don't know how long we've had the armored vehicle, whether rounds have been put through it or not. That's a 1977 armored vehicle given to us by the Army. I don't know what they've done to it. I don't know the history of that vehicle."

Law, who was behind the ARV, testified that when the shots were fired, his head and the left side of his body were exposed. He estimated that the shots came within a foot and a half of his body. He felt the "whiz" of a bullet going over his head and he heard another bullet hit the ARV.

Law testified that there was no doubt in his mind that Robbins was trying to kill him. But he admitted that in his written statement he did not say that Robbins shot at him; he only said that shots were fired in his direction. Smith, who was also behind the ARV, testified that he was exposed from his chin to his forehead and that he felt one of the bullets hit the ARV approximately four feet in front of him.

### Analysis

■ From the evidence just recited, the jury could have rationally determined, beyond a reasonable doubt, that Robbins had the specific intent to kill the officers. He shot a gun in the direction of each of the officers. Each of the officers except Cataldi was able to testify that a bullet came close to him. Some officers also testified that they saw Robbins aim in the direction

of particular officers. Moreover, the jury could have inferred that Robbins had the intent to kill from his conduct and words. The jury could have accepted the officers' testimony that Robbins was attempting to determine their positions when he came out of his house and looked around. Robbins's insinuations regarding things getting ugly, armor-piercing bullets, and taking officers out with him could be viewed as threats to kill some or all of the officers involved in the standoff. For all of the officers except Moreland, the jury could also have inferred from Robbins's words immediately before shooting that he intended to kill. Before shooting at Ruiz, he said that he was focusing his sights on Ruiz. Before shooting at Cataldi, he said that if the PA team did not shut up he was going to start shooting. He also attempted to get Cataldi to state where he was. Before shooting at the officers stationed at the ARV, he challenged them to a game of quick draw and demanded that they get out of his driveway.

Robbins argues on appeal that he was more interested in harming himself than he was in harming the officers. Indeed, the record does contain evidence from which the jury could have inferred that Robbins was attempting to commit "suicide by cop."[3] But the jury was not required to draw this inference, and we must view the evidence and the inferences therefrom in the light most favorable to the jury's verdict.[4] Having done this, we conclude that a rational jury could have found beyond a reasonable doubt that Robbins intended to kill the officers.

Robbins relies on *King v. State*, 166 Tex.Crim. 230, 312 S.W.2d 677 (1958), in which the defendant was convicted of assault with intent to murder with malice. In that case, an officer went to the defendant's home to warn him to stay away from a neighbor's house. Although he was in his house when the officer arrived, the defendant refused to let the officer in or to exit the house himself. He also "talked as if he 'didn't have the right sense' or was 'cracking up,' indirectly threatened the neighbor and laughed." When three more officers arrived at the scene, the defendant came out of the house with a rifle. The officers told him to drop the rifle, but he ran around his house instead, and the officers ran after him. The defendant "turned as he ran and shot his rifle and the officers heard the bullet 'whistle' by them." He continued running and was trying to reload his rifle when the officers caught him. *King*, 166 Tex.Crim. at 230–31, 312 S.W.2d at 677. Without mentioning its reasons, the court stated, "From a careful consideration of these facts, we are unable to reach the conclusion that they are sufficient to show [the defendant] guilty of the offense of assault with intent to murder with malice." *Id.* at 231, 312 S.W.2d at 677–78.

Twenty-eight years later, the court considered the effect of *King* in a prosecution for the attempted capital murder of a peace officer. *See Godsey v. State*, 719 S.W.2d 578, 580–82 (Tex.Crim.App.1986).

---

**3.** Ruiz testified that he heard Robbins yell "suicide by cop." There was evidence that Robbins had been depressed as a result of problems in his personal life. The jury could have also inferred that Robbins wanted the officers to shoot him based on some of his behavior, such as his refusal to comply with the officers' instructions when he surrendered.

**4.** Furthermore, as our discussion of the *Godsey* case, below, demonstrates, the inference that Robbins was trying to commit "suicide by cop" is not necessarily inconsistent with the inference that he intended to kill the officers.

In *Godsey,* the appellant aimed a gun at several officers. *Id.* at 580. There was evidence that he was suicidal. *Id.* The appellant relied on *King* to support his argument that the State failed to prove he had the specific intent to kill. *Id.* at 581. The court addressed this contention as follows:

> [*King* ] was a prosecution for assault with intent to murder with malice. While the opinion is not clear on what basis the evidence was insufficient, it seems evident that malice was not proved. Malice requires cool, deliberate action or premeditation. The sheriff stated that the defendant talked as if he were "cracking up." Thus, although not specifically stated, it appears that the evidence was insufficient to that extent. The court did not address or discuss specific intent to kill, which could be present despite the absence of malice. *King,* does not support appellant's contention that specific intent was found to be lacking in *King* and therefore, by comparison, is not shown by the facts of the instant case.

*Id.* at 581–82 (citations omitted). The court further held that the evidence was legally sufficient to establish that the appellant had the specific intent to kill, stating:

> Appellant was not merely waving the gun around. He deliberately pulled it out, after seeing the armed officers with their guns pointed at him. He ignored their orders not to draw the gun and then to drop the gun. And, finally, he pointed the gun in such a way that it was almost as if he were 'drawing a

bead' on [the officers]. In addition, the jury heard the evidence about appellant's suicide wishes. The inference to be gotten from the evidence and one which supports an intent to kill, is that appellant could have decided to shoot the officers so that they would then shoot him.

*Id.* at 583. Based on the reasoning in *Godsey,* we conclude that *King* is distinguishable from this case and that the evidence was legally sufficient to establish the specific intent to kill.

The other cases cited by Robbins are also distinguishable. In both *Davis v. State,* 516 S.W.2d 157, 160 (Tex.Crim.App. 1974), and *Neal v. State,* 534 S.W.2d 675, 675–76 (Tex.Crim.App.1975), there was no evidence that the defendants pointed the guns, much less fired them. In *Sloan v. State,* 76 S.W. 922, 922–23 (Tex.Crim.App. 1903) and *Ginn v. State,* 128 Tex.Crim. 109, 110–11, 79 S.W.2d 327, 327–28 (1935), the evidence indicated that the guns were incapable of killing the purported victims under the circumstances in which they were used. In *Brown v. State,* 142 Tex. Crim. 405, 405, 408, 154 S.W.2d 464, 464–65 (1941), the defendant was only charged with threatening to take the life of the purported victim, and he only pointed the gun without firing it. *See Godsey,* 719 S.W.2d at 582 (discussing and distinguishing *Davis, Neal, Sloan, Ginn,* and *Brown* ).[5]

### The Aggravated Assault Counts

The assault statute provides:

---

**5.** Robbins did not cite *Godsey* in his brief. But he lifted, verbatim, nearly his entire argument regarding the attempted capital murder counts from that opinion, omitting the portions of the opinion that are unfavorable to his argument, such as the following statement: "Naturally, the most obvious cases and the easiest ones in which to prove a specific intent to kill, are those cases in which a firearm was used and was fired or attempted to have been fired at a person." *Godsey,* 719 S.W.2d at 581. He also omitted portions of the opinion that explained and distinguished *King, Davis, Neal, Sloan, Ginn,* and *Brown.*

(a) A person commits an offense if the person:

(1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse;

(2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; *or*

(3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.

TEX. PEN.CODE ANN. § 22.01(a) (Vernon Supp.2004) (emphasis added). The aggravated assault statute provides:

(a) A person commits an offense if the person commits assault as defined in § 22.01 and the person:

(1) causes serious bodily injury to another, including the person's spouse; *or*

(2) uses or exhibits a deadly weapon during the commission of the assault.

*Id.* § 22.02(a) (emphasis added).

It is apparent from these statutes that an aggravated assault may be committed in several different ways. In this case, the indictment alleged that Robbins intentionally and knowingly threatened Officers Reveles and Contreras with imminent bodily injury and that he used and exhibited a deadly weapon—a firearm—during the commission of the assault. Tracking the indictment, the jury charge authorized a conviction only if the jury found that Robbins intentionally or knowingly threatened Reveles and Contreras with imminent bodily injury while using or exhibiting a firearm. Thus, Robbins was charged with aggravated assault pursuant to sections 22.01(a)(2) and 22.02(a)(2).

▪ Robbins argues that the evidence is legally insufficient because there is no evidence that he intended to cause bodily injury or serious bodily injury to the officers. But Robbins was not charged with committing aggravated assault by *causing* bodily injury or serious bodily injury; he was charged with committing aggravated assault by *threatening* the officers with bodily injury while using or exhibiting a firearm. Therefore, whether Robbins actually intended to cause bodily injury is irrelevant.

▪ As noted in our discussion of the attempted capital murder counts, both Reveles and Contreras were stationed near the ARV and there is evidence that both of them were in the line of fire when Robbins pointed and shot his gun in the direction of the ARV. doubt, that Robbins intentionally or knowingly threatened the officers with bodily injury while using a firearm. *See Cantu v. State*, 953 S.W.2d 772, 775 (Tex.App.-Corpus Christi 1997, pet. ref'd) (holding that evidence that the defendant pointed a loaded gun at an officer was legally sufficient to support a conviction for aggravated assault).

Robbins's first issue is overruled.

### JURY ARGUMENT

▪ In his second issue, Robbins argues that during closing argument at the guilt/innocence phase the prosecutor improperly suggested that he should be punished in accordance with the law-enforcement community's expectations and to the same degree as a murderer or rapist. The complained-of argument appears in the record as follows:

Lastly, ladies and gentlemen, your word is going to send a message to the police of this city, it really will. What kind of message will it send? How much do their lives mean to you? That's the message you'll be sending. Is it part of their job to be shot at? Do

you not care if they're shot at? Do you care? You're a representative of the community, and your verdict is going to send a message to all those men seated right over there.

I'm going to end with you, ladies and gentlemen, just very simply. You—all the time you hear terrible stories of crime and rape and murder on the media. And I'm sure some of you at one time have asked why doesn't someone do something about it, why doesn't someone make America a better place.

[Defense Counsel:] Your Honor, I'm going to object to this line of argument. He's not being punished for the problems in America. We're here for this indictment, these 15 counts in this indictment, Your Honor.

[Prosecutor:] Your Honor, it's a plea for law enforcement.

The Court: Yes, sir. I'll overrule the objection.

[Prosecutor:] I'm sure at one time you asked why didn't someone do something about it. Well, as you sit here today, you are that somebody. You can do something about it today. And by your verdict you'll say does El Paso County want a man like Mark Robbins living here?

To determine whether the prosecutor made an improper argument, we must consider the entire argument, not merely isolated sentences. *Rodriguez*, 90 S.W.3d at 364. The prosecutor may express an opinion on the serious nature of the offense by contrasting it with other cases or crimes in general, as long as the prosecutor does not delve into the details of the other cases or crimes. *Id.* The prosecutor may also make a plea for law enforcement. *Borjan v. State*, 787 S.W.2d 53, 55–56 (Tex.Crim. App.1990); *Rodriguez*, 90 S.W.3d at 364. A plea for law enforcement may take many forms, one of which is to argue the rela-

tionship between the jury's verdict and the deterrence of specific crimes or crime in general. *Borjan*, 787 S.W.2d at 55. The State may also remind the jury of the effect that its verdict may have on specific segments of the community or the community in general. *Id.* at 56. Thus, the State may ask the jury to represent the community or to send a message to the community. *Harris v. State*, 122 S.W.3d 871, 887–88 (Tex.App.-Fort Worth 2003, no pet.). The State may not, however, argue that the community or a specific segment of the community expects or demands a particular verdict or a particular punishment. *Borjan*, 787 S.W.2d at 56; *Cortez v. State*, 683 S.W.2d 419, 420–21 (Tex.Crim.App. 1984); *Rodriguez*, 90 S.W.3d at 365.

■■ Robbins did not object to the prosecutor's argument on the ground that it was an improper community expectation argument. Therefore, he has waived his argument in this regard. *See Mathis v. State*, 67 S.W.3d 918, 926–27 (Tex.Crim. App.2002); *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex.Crim.App.1996); *Harnett v. State*, 38 S.W.3d 650, 661 (Tex.App.-Austin 2000, pet. ref'd).

■■ In any event, the prosecutor's argument did not suggest that the community or police officers expected or demanded a guilty verdict or a particular punishment. Instead, it was an invitation to the jury to represent the community and to send a message to the officers that it values their service and their lives. The Court of Criminal Appeals approved of a similar argument in a case in which the defendant was charged with shooting at a police officer. *See Rhodes v. State*, 450 S.W.2d 329, 330–31 (Tex.Crim.App.1970). In that case, the prosecutor made the following argument:

You can, on the one hand, say to [the officer] . . . and all of the rest of them

with the Houston Police Department: 'You may go and do the best you can to stop crime. We don't mind if you get shot; we don't care, and we are not going to support law enforcement in this county.' Or by your verdict you may say, 'Officer ... and those that serve with you, we are proud of you and we appreciate what you are doing for us. We want to help in every way that we can. When [the defendant] takes his pistol and tries to kill you, we are going to support you and find him guilty of the offense ..., because this is what he did.'

*Id.* at 331–32. The court held that this was a proper plea for law enforcement. *Id.* at 332.

As for the prosecutor's references to rape and murder, these references were made within the context of an argument on the relationship between the jury's verdict and the deterrence of crime in general. The prosecutor did not delve into detail about these other crimes. Accordingly, we conclude that the argument was a proper plea for law enforcement.

Robbins's second issue is overruled.

## CONCLUSION

For the reasons stated herein, the judgment of the trial court is affirmed.