Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio

★ ★ ★  ★ ★ ★

# MEMORANDUM OPINION

No. 04-08-00910-CR

David S. **LOPINTO**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 186th Judicial District Court, Bexar County, Texas
Trial Court No. 2007-CR-8811
Honorable Maria Teresa Herr, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:       Karen Angelini, Justice
                Steven C. Hilbig, Justice
                Marialyn Barnard, Justice

Delivered and Filed: March 31, 2010

AFFIRMED

David S. Lopinto was found guilty of murdering his father, Charles Lopinto, and was sentenced to fifty years of imprisonment. He was also found guilty of aggravated assault with a deadly weapon against his stepmother, Jocelyn Lopinto, and was sentenced to fifteen years of imprisonment. On appeal, he argues (1) there is legally and factually insufficient evidence to support his conviction for aggravated assault with a deadly weapon; (2) there is legally and factually insufficient evidence to support the jury's implicit rejection of his claim that he acted in self-defense

or defense of others when he killed Charles; and (3) there is factually insufficient evidence to sustain the jury's rejection of his claim that he caused Charles's death under the immediate influence of sudden passion. We affirm.

## BACKGROUND

In August 2007, twenty-seven-year-old David Lopinto was living with his father, Charles, his stepmother, Jocelyn, his teenage stepsister, April, his infant half-sister, Jamilla, and his three-month-pregnant girlfriend, Shanda Grace Randle, who was known as "Chocolate." David and Chocolate lived in the garage that had been converted into a bedroom. At trial, David, who testified in his own defense, stated that he gave his father $100 a month to help with expenses and would buy about $80 to $90 a month worth of groceries. According to David, he did not have a job, but he sold drugs, including cocaine, to make money. And, although he made a lot of money selling drugs, Chocolate's use of drugs decreased his profit.

Money became an issue between David and his father, Charles. David's step-mother, Jocelyn, testified that on the day of the murder, August 31, 2007, they had received a high electric bill. According to Jocelyn, Charles attributed the high bill to two security lights David had installed in the front of the house. As a result, Charles broke the lights.

David testified that on August 31, 2007, Jocelyn approached him and showed him the electricity bill. She asked him if he had any money to help with the bill, but David told her that he did not have any money at the moment. According to David, Jocelyn was upset with him for not helping with the bill. When David came home that night around 8:00 p.m., he noticed the lights in the front were not working. According to David, he had installed the lights to protect Chocolate and

the home from being burglarized.[1] David testified that when he realized the lights had been broken, he became very angry and went inside the house to confront his father. When he went inside, Chocolate was sleeping in their bedroom, and his father's bedroom door was closed. David testified that he yelled through the bedroom door, "Dad, Dad, did you break the light?" According to David, Charles yelled back, "You don't f--king pay bills." David started cursing back and turned to leave. David then went to his bedroom and grabbed his baseball bat. He went outside to the front yard and started hitting a plastic chair and a bug zapper.

Once David was outside in the front yard, a security video he had installed began recording events taking place in the front yard. A transcript of this recording was entered into evidence. The narration on the transcript begins by noting crashing sounds. According to the transcript, David then states, "Not f--king funny bitch!" The narration on the transcript then notes distant arguing inside the home and states that both David and Charles go outside. David begins cursing and stating things like, "I'll give you something to f--king break, bitch!" The narration then notes the sound of something hitting metal. Charles then yells, "Get the police." David and Charles start arguing about money, about whether David puts Chocolate before his family, about Jocelyn, and about whether Charles gave money to David when he was in prison. Charles repeatedly yells at David, telling him to move out of the home. Toward the end of the transcript, David yells, "I won't leave unless I have my f--king sh-t!" Charles replies, "You promise tonight?" David states, "Give me my sh-t, and I will leave your f--king ass forever." Charles then states, "Oh. Don't come back. Don't come back. Just

---

[1] When asked by the prosecutor whether he installed the lights because, as a drug dealer, he would want to see who was approaching the house, David claimed that he did not need security lights for that reason, as he always sold drugs down the street in a laundromat.

go. Leave forever. Please. Please do that. Please do that." The narration on the transcript then ends
with the following:

> ***Seven minutes or so of quiet. Police car drives into cul-de-sac and parks point SE
> with lights on. Policeman exits car and walks in front of car hood. Knocking on
> window. Shot (uh) . . . shot . . . shot . . . shot . . . shot . . . shot.***
>
> ***SAPD Officer Walter Smith: Shots fired, shots fired.***

According to Jocelyn's testimony at trial,[2] on the night of the murder, Charles had been upset
about the security lights and had used a long stick to smash all the lights. After dinner, she, Charles,
her teenage daughter, April, and her baby all went to the master bedroom to watch television. Jocelyn
testified that David came to the bedroom door "screaming, cussing, and yelling bad words." Charles
told Jocelyn that he was going to go tell David that he had broken the lights. When Jocelyn heard
yelling, she decided to call 911 but hung up before saying anything.[3] Jocelyn then went outside and
saw Charles and David wrestling with the baseball bat. Charles yelled at Jocelyn that David had hit
him three times with the bat.[4] Jocelyn tried to grab the bat, but was unable to do so. Chocolate, who
was standing by the garage, said that she would take the bat away from David and Charles. Jocelyn
then said that it would be better if Chocolate and David left the house. Jocelyn testified, "Chocolate
reacted to what I said and she was yelling at me." Jocelyn further testified that Chocolate then
slapped her. So, Jocelyn pushed Chocolate away. According to Jocelyn, when Charles told her to go
call 911, she turned around to go back inside the house but Chocolate followed her and pushed her

---

[2] Jocelyn, who was from the Philippines, testified in her native language, which was then interpreted into English by an interpreter.

[3] Based on the hangup, Officer Walter Smith was dispatched to the home.

[4] On the transcript, Charles states, "Hit me three times with it – Have some f--king respect . . ." He then states, "He hit me three times with it. He hit me three times with it."

against the metal door. Jocelyn ran inside and closed the master bedroom door. Chocolate then began pounding on the door. Jocelyn used a cell phone to call 911. At that point, Charles came inside the bedroom, took the phone away from Jocelyn, and began talking to the 911 operator. Charles used another cell phone to call his pastor, "Brother Earl." Jocelyn testified that Charles told Brother Earl, "Pastor, I've been hit." According to Jocelyn, Charles meant that he had been hit by the baseball bat. Charles left the bedroom and closed the door. Jocelyn saw the police car outside the house. She then heard gunshots:

> I waited for a few minutes. . . . It was silence, and I didn't know what to do. I was scared. I wanted to find out what happened and I don't know. I open the door and then I opened the door. I stood by the doorway and I saw the – the gunshots [sic] pointed at me. Pointed at me. And it was shot several times. And it was like fire coming out of it. . . . I saw him [David] holding the gun and pointing the gun at the hallway.

Jocelyn testified that after shots were fired at her, she panicked and began banging on the bedroom window to get the police officer's attention. Later, Jocelyn confirmed that when she peeked out of her bedroom door, she saw David at the end of the hallway. According to Jocelyn, she banged on the windows "after David tried to shoot me."

Chocolate testified that on the night of August 31, 2007, she was asleep in the bedroom she shared with David when she awoke to "a lot of yelling." David had opened the garage door, and Chocolate could see David holding a bat in front of the house. He and Charles were arguing with each other. According to Chocolate, David was holding the bat and hit Charles twice with it. Charles and David then began struggling over the bat. Chocolate tried to take the bat away. Chocolate testified that Jocelyn then pushed her, and she pushed Jocelyn back, trying to get her to go inside the house. David and Charles were struggling behind her when something happened and they all three

landed in the bushes. Chocolate testified that she then went inside the house to see where Jocelyn and April were. When she saw that they were in the master bedroom, she went back to her bedroom. David came into the bedroom through the garage door:

> He was very upset and – and just – I was trying to talk to David at that point and he was trying to get what was going on, what happened, and calm down. . . . He was talking to me and he was saying – he went to the safe and he had got the gun. So he did that. I just started talking about other things that could be done besides that.

According to Chocolate, David said that he was going to kill his dad if the police came to the house. Chocolate testified that she was trying "to say whatever [she] could say" when she saw on the surveillance camera that the police had arrived. She told David that the police were there. According to Chocolate, both she and David saw on the surveillance camera that the police had arrived: "[W]e could see. We were both there. And then right after that, [David] just took off running." Chocolate testified that she saw David run off toward the inside of the house. She tried to catch him but failed: "I stayed behind him until the point where he got by the front door. And the first shot came off, and I turned around and ran and got on the kitchen floor." After firing about five or six shots, David fled, running out the back door.

David testified that he killed Charles in defense of himself and of Chocolate. According to David, his father was abusive and physically much bigger than himself. He claimed that when he was hitting the chairs outside with the bat, Charles said, "I'll kill you."[5] David testified that Charles then jumped in front of him. According to David, he hit Charles with the bat to get Charles away from him. David testified that he and Charles began struggling with the bat and that Charles said he did not want David anymore, which David claimed he perceived as a threat to kill him. Further, David

---

[5] The transcript does not show that Charles ever threatened to kill David. However, there are portions of the transcript that were indecipherable.

testified that he interpreted Charles's order to Jocelyn to call "Brother Earl" as a threat. According to David, calling Brother Earl meant that Brother Earl was going to bring over guns. After he, Charles, and Jocelyn landed in the bushes, David went back into his bedroom through the garage door and slammed the door down. He was calling his mother on his cell phone when he tried to open the garage door but was unable to do so because the door was jammed. David testified that Chocolate was trying to talk to him, but he was not listening because he had his cell phone earpiece in and was listening to ringing in his ear. He then went and got his gun out of the safe:

> I was just scared. And you know, I wanted to protect my baby's life. I tried to get a hold of my mom, and it was just ringing and ringing. When I looked up, Chocolate had her hair pulled up and her shirt over her belly, and the first thing [in] my mind was to protect my baby. So I went to the safe, sir.

David claimed that in his past experiences with Charles, when Charles was mad, he was out of control and "just hurt[] people." "And he was calling Brother Earl." According to David, he knew Charles had a gun and thought Brother Earl was coming with guns. So, he just wanted to get out as quickly as possible. David testified that because the garage door was jammed, he ran to the front door. As he turned around to see if Chocolate was following him, Charles said, "What the f--k are you doing?" and rammed David into a bookcase. David testified that he thought Charles was going to kill him, so David fired the gun. David then testified that he was running back to his bedroom when he fell, causing another shot to go off toward the hallway. When asked whether he had seen Jocelyn in the hallway, David replied that he had not.

On cross examination, the prosecution asked David why he did he not use the other door to his garage bedroom to flee the house. David claimed the quickest and easiest way out of the house was to use the front door because the other garage door was enclosed with security bars.

Q:     I didn't say it was easy. I'm just saying if you really thought that there was somebody out there [who] was going to kill you, [using the other garage door] would be the safe way out.

A:     The safe way is to go out the front door.

Q:     Would that be safe if you thought there was somebody out there [who] wanted to kill you, [who] was calling Brother Earl [who] had a gun?

A:     I had protection. *So why would I be scared now? I had protection now.*

Q:     Oh, I got you. Okay. So now you've got the gun, you're not worried about anything?

A:     I just wanted to get out of the house. That's what I was worried about.

(emphasis added).

## STANDARD OF REVIEW

In a legal sufficiency review, we view the evidence in the light most favorable to the verdict and then determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Prible v. State*, 175 S.W.3d 724, 729-30 (Tex. Crim. App. 2005). In a factual sufficiency review, we view all the evidence in a neutral light and will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could not have been met. *Id.* at 730-31.

Further, when a defendant challenges the factual sufficiency of the rejection of a defense, we review all the evidence in a neutral light and ask whether the State's evidence taken alone is too weak to support the finding and whether the proof of guilt, although adequate if taken alone, is

against the great weight and preponderance of the evidence. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).

Finally, we may conduct a factual sufficiency review of a jury's negative finding on the sudden passion issue in the punishment stage of trial. *Cleveland v. State*, 177 S.W.3d 374, 390 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *Inocencio v. State*, No. 04-06-00823-CR, 2007 WL 3171340, at *1 (Tex. App.—San Antonio 2007, no pet.) (not designated for publication). Because a defendant has the burden of proof on the issue of sudden passion by a preponderance of the evidence, *see* TEX. PENAL CODE ANN. § 19.02(d) (Vernon 2003), in conducting a factual sufficiency review, we consider all the evidence relevant to the issue in a neutral light to determine whether the verdict is so against the great weight and preponderance of the evidence as to be clearly wrong or manifestly unjust. *See Hernandez*, 127 S.W.3d 206, 212 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd); *Inocencio*, 2007 WL 3171340, at *1.

### AGGRAVATED ASSAULT WITH A DEADLY WEAPON

Count II of the indictment alleged that David intentionally or knowingly threatened Jocelyn with imminent bodily injury by shooting at her and that he used or exhibited a deadly weapon, namely a firearm. Pursuant to section 22.01 of the Texas Penal Code, a person commits assault if he intentionally or knowingly threatens another person with imminent bodily injury. TEX. PENAL CODE ANN. § 22.01(a)(2) (Vernon Supp. 2009). A person commits aggravated assault if he commits assault, as defined in section 22.01, and uses or exhibits a deadly weapon during the commission of the assault. *Id.* § 22.02(a)(2). Further, a person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a). A person acts knowingly, or with knowledge,

with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. *Id.* § 6.03(b). A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.*

Here, David claims the evidence is legally and factually insufficient to support his conviction for aggravated assault with a deadly weapon, because there is no evidence or factually insufficient evidence to show that he knew Jocelyn was present when he fired the shots down the hallway.[6] David argues that he did not act intentionally or knowingly because he did not know Jocelyn was at the end of the hallway. He emphasizes that the hallway was dark and that Jocelyn herself admitted the hallway was dark. Jocelyn, however, also testified that when she opened the bedroom door, she saw David standing at the end of the hallway pointing a gun at her. She then testified that she saw "fire" coming out of the gun. Such evidence is legally sufficient to infer David acted intentionally or knowingly. *See Robbins v. State*, 145 S.W.3d 306, 314 (Tex. App.—El Paso 2004, pet. ref'd) (holding that evidence that defendant pointed and shot gun in direction of an armored rescue vehicle was legally sufficient to show that defendant intentionally or knowingly threatened SWAT officers with bodily injury while using a firearm).

With respect to factual sufficiency, it was the jury's province to assess David's and Jocelyn's credibility, and we must defer to the jury. *See Johnson v. State*, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000). We therefore hold that the evidence is both legally and factually sufficient to support David's conviction of aggravated assault with a deadly weapon.

---

[6] Although David's testimony at trial was that the gun accidentally discharged when he fell, on appeal he now argues that the evidence is insufficient to show that he acted intentionally or knowingly in firing the gun down the hallway.

## MURDER

David also argues that the evidence is legally and factually sufficient to support the jury's implicit rejection of his claim that he acted in self defense or defense of others. David points to his own testimony of Charles's abusive behavior toward him. He argues that Charles had a "volcanic temper." He emphasizes that Charles was physically a much bigger man than himself. He argues that when he left his bedroom with his gun and headed toward the front door, he was attempting to retreat but was confronted by Charles and attacked. The jury, however, was free to disbelieve David's testimony.

Further, David's own girlfriend, Chocolate, testified that David came to their bedroom, took the gun out of the safe, and then threatened to kill Charles if the police came. According to Chocolate, she then saw that the police had arrived on the surveillance camera. When she told David that the police had arrived, David "took off running" toward the inside of the house. She then heard shots fired. David, himself, testified that once he had his gun, he was no longer in fear of Charles. There is legally sufficient evidence to support the jury's rejection of his self defense and defense of others claim. And, with respect to factually sufficiency, credibility questions like these that turn on an evaluation of credibility and demeanor of the witnesses are the province of the jury. *See Johnson*, 23 S.W.3d at 8. We must defer to the jury's resolution of such credibility issues. *See id.* We therefore hold that the evidence is also factually sufficient to support the jury's rejection of David's self defense and defense of others claim.

## SUDDEN PASSION

In his final issue, David argues that the evidence is legally insufficient to sustain the jury's rejection of his claim that he killed Charles under the immediate influence of sudden passion arising from an adequate cause. During the punishment phase, the jury was charged the following:

> If a defendant is convicted of murder, the defendant may raise and prove by a preponderance of the evidence that he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant raises and proves the special issue in the affirmative by a preponderance of the evidence, the offense is punished as a second degree felony.

*See* TEX. PENAL CODE ANN. § 19.02(d) (Vernon 2003). The jury answered that it did not find that David caused Charles's death under the immediate influence of sudden passion arising from adequate cause.

"Sudden passion" means passion "directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." *Id.* § 19.02(a)(2). "Adequate cause" means cause that "would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

David argues that the evidence is factually insufficient because the great weight and preponderance of the evidence shows that he was trying to retreat from the home when Charles attacked him, pushed him into a bookcase, and struck him in the face. David emphasizes that he thought Charles had a weapon, which is why he fired the gun. According to David, this "vicious assault" on him by Charles in the darkened alcove was "undoubtedly adequate cause," which "understandably caused rage and terror in David's mind." David argues that Charles's attack "eliminated any opportunity for cool reflection." The jury, however, was free to disbelieve David's

testimony. The jury was also free to believe Chocolate, who testified that David came into the bedroom, threatened to kill Charles if the police arrived, and then "took off running" toward the inside of the house once Chocolate told him the police had arrived. We hold that the evidence is factually sufficient to support the jury's rejection of David's sudden passion claim.

### CONCLUSION

We affirm the judgment of the trial court.

Karen Angelini, Justice

Do not publish