

IN THE
TENTH COURT OF APPEALS

No. 10-17-00012-CR

MICHAEL HANLEY PENIX,

Appellant

v.

THE STATE OF TEXAS,

Appellee

From the 54th District Court
McLennan County, Texas
Trial Court No. 2015-2036-C2

## MEMORANDUM OPINION

Appellant Michael Hanley Penix entered a plea of guilty to the murder of his wife.

After electing to have the jury assess punishment, Penix was sentenced to ninety-nine

years' incarceration. In his present appeal, Penix raises one issue—the prosecutor made

an improper closing argument. We will affirm.

### Background

The evidence introduced at trial established that Penix murdered his wife,

Rebecca, on the evening of September 12, 2015. Penix emptied his five-shot revolver into

Rebecca's body while she lay helpless on the bedroom floor with her hands raised. During closing argument, the prosecutor stated: "Timothy McVeigh was an Eagle Scout. He served his country. He deserved to die." Defense counsel made a prompt objection, which the trial court sustained. Defense counsel then moved for a mistrial, which the trial court denied. Defense counsel then requested that the trial court instruct the jury to disregard the prosecutor's remark and again moved for a mistrial. The trial court instructed the jury, "Instruct the jury to disregard the last comment of counsel for the State" and denied the second motion for a mistrial.

### *Analysis*

Penix asserts as error the prosecutor's argument to the jury. The appropriate focus, however, is whether the trial court abused its discretion in denying Penix's motion for mistrial. *See Hawkins v. State*, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004). We uphold the trial court's denial of a motion for mistrial if it was within the zone of reasonable disagreement. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). When a trial court sustains an objection to an improper jury argument and instructs the jury to disregard the argument, but denies a motion for mistrial, as here, we assume without deciding that the argument was improper and look only to whether the trial court abused its discretion when it denied the motion for mistral. *See Hawkins*, 135 S.W.3d at 76-77.

> [T]he question of whether a mistrial should have been granted involves most, if not all, of the same considerations that attend a harm analysis. A mistrial is the trial court's remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile." In effect, the trial court conducts an appellate function: determining whether improper conduct is so harmful that the case must be redone.

*Hawkins*, 135 S.W.3d at 77 (footnoted citation omitted). Thus, the appropriate test for evaluating whether the trial court abused its discretion in overruling a motion for mistrial is a tailored version of the test originally set out in *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998), a harm analysis case. *Id*. The *Mosley* factors that we consider in determining whether the trial court abused its discretion in denying a mistrial are: (1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks), (2) any curative measures (the efficacy of any cautionary instruction by the judge), and (3) the certainty of the punishment assessed absent the misconduct (the likelihood of the same punishment being assessed). *Id*. Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required. *Id.; see also Archie*, 221 S.W.3d at 699. Otherwise, when the prejudice is curable, an instruction by the court to disregard eliminates the need for a mistrial. *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004). The law generally presumes that a jury will follow the trial court's instruction to disregard. *See Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009); *see also Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). Only offensive or flagrant error will mandate reversal after a trial court gives an instruction to disregard. *Phillips v. State*, 130 S.W.3d 343, 356 (Tex. App.—Houston [14th Dist. 2004), *aff'd*, 193 S.W.3d 904 (Tex. Crim. App. 2006); *see also Williams v. State*, 417 S.W.3d 162, 176 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). "[O]nly in the most egregious cases when there is an 'extremely inflammatory statement' is an instruction to disregard improper argument considered an insufficient response by the trial court." *Moore v. State*, 999 S.W.2d 385,

405-06 (Tex. Crim. App. 1999) (quoting *Waldo v. State*, 746 S.W.2d 750, 753 (Tex. Crim. App. 1988)).

Proper jury argument falls into four general categories: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answer to opposing counsel's arguments; and (4) plea for law enforcement. *Gallo v. State*, 239 S.W.3d 757, 767 (Tex. Crim. App. 2007). A prosecutor cannot use closing argument to put matters before the jury that are outside the record and prejudicial to the accused. *Everett v. State*, 707 S.W.2d 638, 641 (Tex. Crim. App. 1986); *Gonzalez v. State*, 115 S.W.3d 278, 284 (Tex. App.—Corpus Christi 2003, pet. ref'd). Comparing a defendant or his acts to an infamous criminal is considered "an improper and erroneous interjection of facts not in the record that is harmful to the accused." *Gonzalez*, 115 S.W.3d at 284-5. However, a prosecutor's reference to a notorious individual in closing argument that does not make a direct comparison to the defendant is less likely to be found by the courts to be improper or harmful to the defendant's case. *See Martinez v. State*, No. 08-15-00124-CR, 2018 WL 3084147, at *8 (Tex. App.—El Paso June 22, 2018, no pet.) (mem. op., not designated for publication);[1] see also *Primes v. State,* 154 S.W.3d 813, 815 (Tex. App.—Fort Worth 2004, no pet.) (trial court did not abuse its discretion in denying defendant's motion for mistrial where prosecutor responded to testimony of defendant's family regarding their love for defendant by commenting that "Ted Bundy's mother loved him too," as comment did

---

[1] Under Rule 47.7(a) of the Rules of Appellate Procedure, unpublished memorandum opinions not designated for publication have no precedential value but may be cited with the notation, "(not designated for publication)." Unpublished memorandum opinions are persuasive rather than binding precedent that the court may follow or reject. *See Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

not directly compare Bundy's actions to those of defendant); *Luna v. State*, No. 08-13-00151-CR, 2015 WL 4572276, at *6 (Tex. App.—El Paso July 29, 2015, pet. ref'd) (mem. op., not designated for publication) (trial court did not err in denying motion for mistrial where prosecutor merely asked jury if they had heard of Bernie Madoff and made no direct comparison of Madoff to defendant); *see also Alford v. State*, No. 05-98-00262-CR, 2000 WL 175115, at *6-7 (Tex. App.—Dallas Feb. 16, 2000, no pet.) (mem. op., not designated for publication) (prosecutor's statement that "Ted Bundy had a paper route when he was a boy," did not warrant reversal where made in response to defense counsel's argument that defendant was hard-working and was not meant to compare Bundy's conduct with that of defendant).

In determining whether a prosecutor's reference to a notorious criminal was improper, we must consider it in the context that it was made, examining the "entire argument, not merely isolated sentences." *Robbins v. State*, 145 S.W.3d 306, 314-15 (Tex. App.—El Paso 2004, pet. ref'd); *see also Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988). In closing argument, the defense attorneys argued that the murder was an aberration, possibly caused by Penix's use of Ambien and Xanax, that Penix was a low risk as a repeat offender, and that the jury should not judge Penix solely on the basis of the worst thing he had ever done. Immediately prior to the reference to Timothy McVeigh, the prosecutor stated: "Defense counsel said, What's the measure of a man? Should we judge a man by the worse moment of his life?" Taken in context with the defense argument, the prosecution's reference to Timothy McVeigh was obviously a

reference to the fact that people who commit bad acts can also commit good ones, but those good acts should not excuse them from being punished appropriately. The prosecutor did not directly compare Penix to Timothy McVeigh or his acts; therefore, the one-time reference to Timothy McVeigh, when considered in the context of the trial and the defense closing argument, was not so egregious that it could not be remedied by an appropriate limiting instruction. As the *Archie* court noted, "Under the facts of this case, we conclude that, in sustaining appellant's objection and instructing the jury as it did, the trial court sufficiently ameliorated any potential harm." *Archie*, 221 S.W.3d at 700.

The *Gonzalez* case cited by Penix is readily distinguishable. *See Gonzalez*, 115 S.W.3d at 278. In closing argument, the prosecutor compared Gonzalez to Osama bin Laden. After the trial court sustained an objection to those remarks, the prosecutor then compared Gonzalez's gang, the Mexican Mafia, to al Qaida. The Corpus Christi Court found the remarks to be so egregious that the trial court's limiting instruction could not overcome the prejudice to Gonzalez, particularly in light of the fact that the trial was conducted only seven months after 9/11, when those "vile and dastardly acts were undoubtedly still fresh in the minds of the jurors." *Id*. at 284. Timothy McVeigh's "vile and dastardly acts," however, were committed in 1995, close to twenty years prior to Penix's trial. Unlike our sister court, we conclude that the prosecutor's reference to Timothy McVeigh was not "a blatant attempt to deprive appellant of a fair and impartial trial." *Id*. at 285.

Finally, the record supports a conclusion that the jury was likely to assess the same punishment in the absence of the prosecutor's remarks. As noted, Penix shot Rebecca at close range while she was lying helpless on the ground, as evidenced by the gunpowder stippling on her face, hands, and forearms. There was no sign of a struggle in the bedroom or the rest of the house. After the shooting, Penix called 9-1-1, stating "My wife woke me up in the middle of the night, and I shot her." He further stated, "My wife woke me up and started arguing with me. I was asleep." When the 9-1-1 operator asked what happened next, Penix replied, "And she kept on arguing with me. I had a gun, and I shot her." He further said, "She kept arguing with me and trying to (unintelligible). She woke me up." The 9-1-1 operator connected Penix to the emergency medical services dispatcher who gave Penix instructions on how to perform CPR. Penix was not noticeably distressed during the 9-1-1 call, but remained calm and gave clear and lucid responses to the dispatchers.

When the police arrived at Penix's house, Penix was still on the phone with 9-1-1 and performing CPR on Rebecca. The officers who testified did not believe that Penix was making an actual attempt at CPR because he was using only one hand, he was barely pressing down, and his hand did not appear to be on her chest. Penix also had no blood on him despite the large amount of blood around Rebecca's body. Penix's demeanor remained calm and coherent when questioned by the police. The only strong emotion Penix exhibited was in response to his dogs barking when the police forced entry into the house. Penix also did not appear to the officers to be under the influence of any substance that would have affected his mental capacity. Penix told officers that he drank a couple

of beers earlier in the day, but he did not mention that he had taken any prescription medication.

Penix told officers that he shot Rebecca when she woke him up, as if he acted in reflex after she startled him. However, Rebecca's body was found on the opposite side of the bed from where Penix slept. In contrast to the statements Penix made to 9-1-1 and to the police, Penix testified at trial that he did not remember much of what occurred the evening Rebecca was murdered. He had no memory of retrieving the gun or firing it. Penix testified that he also could not remember all of his conversations with 9-1-1 or the police. Penix also showed no emotion regarding Rebecca's death during his testimony.

The State introduced witnesses who testified to problems in the Penix marriage, including at least one incident of domestic abuse. Penix admitted that the police had been called after he put his hands around Rebecca's neck, but Rebecca refused to press charges. Penix attributed his actions on that occasion to a mixture of alcohol and medications, remarkably similar to his explanation for Rebecca's murder. Penix presented an expert witness who testified that patients who took the drugs prescribed to Penix—Ambien and Xanax--reported instances of memory loss, as well as aggression and other aberrant behaviors. In rebuttal, the State presented the testimony of Penix's treating physician who testified that Penix had never reported any side effects from his prescriptions, particularly any type of memory loss.

Considering the brutality of the murder, Penix's emotionless response to Rebecca's death, his contradictory statements regarding the events surrounding the murder, and his unsuccessful attempts to deflect responsibility for his actions, the record supports a

conclusion that the jury would likely have returned the same verdict in the absence of the prosecutor's reference to Timothy McVeigh.

After application of the *Mosley* factors, we cannot say that the trial court abused its discretion in denying the motion for mistrial. Accordingly, we overrule Appellant's sole issue and affirm the trial court's judgment.

REX D. DAVIS
Justice

Before Chief Justice Gray,
        Justice Davis, and
        Justice Scoggins
Affirmed
Opinion delivered and filed September 26, 2018
Do not publish
[CRPM]

