

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § |  |
|---|---|---|
| JUAN ANTONIO GONZALEZ, | § | No. 08-14-00293-CR |
|  | § |  |
| Appellant, | § | Appeal from |
|  | § |  |
| v. | § | 346th District Court |
|  | § |  |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
|  | § |  |
| Appellee. | § | (TC # 20120D05048) |
|  | § |  |

## O P I N I O N

This case returns to us on remand from the Texas Court of Criminal Appeals. Appellant was indicted for the capital murder of a police officer. He was convicted of the lesser charge of murder, indicating that the jury did not believe the State proved beyond a reasonable doubt either that the police officer was killed during the performance of his duties, or that Appellant knew the decedent to be a police officer (or possibly both). In his appeal to this Court, Appellant raised fifteen issues challenging the murder conviction. We previously resolved two of the fifteen issues, sustaining one issue which granted Appellant a new trial. *Gonzalez v. State*, No. 08-14-00293-CR, 2017 WL 360690, at *8 (Tex.App.--El Paso Jan. 25, 2017, pet. granted)(not designated for publication). The Texas Court of Criminal Appeals, however, reversed that

holding and remanded for our consideration the remaining thirteen unaddressed issues. *Gonzalez v. State*, 544 S.W.3d 363, 375 (Tex.Crim.App. 2018). We do so and affirm the conviction below.

**BACKGROUND**

This case arises from an incident on September 25, 2012 involving the decedent (twenty-eight year old policeman Jonathan Molina) and three youths (Juan Gomez, Alan Medrano, and Appellant, Juan Antonio Gonzalez). The incident occurred while the youths were walking along the sidewalk of a busy residential street, and one of them, Juan Gomez, is claimed to have "keyed" several parked vehicles, including that of the decedent Jonathan Molina.

Molina emerged from his residence and accused Juan Gomez of keying his car. As we describe in more detail below, the encounter escalated into a fight, during which Appellant used a Judo move to take Molina to the ground and in the process Molina struck his head on the sidewalk. The blow led to a fatal brain injury. The details of what occurred that day were presented through two of the three youths, several passersby, and through Appellant's later Facebook posts. We recount the differing versions of events as testified to before the jury.

**The Passersby**

Mario Ramos was driving westbound along Trowbridge Avenue that afternoon when he noticed two males involved in an argument. He pulled over about two or three houses down to observe through his side view mirror and watched for about two to three minutes. He noticed a teenager and older male face to face and apparently arguing. The two other teens were several feet back and one was motioning as if to gesture, let's leave. The teenager engaged in the argument took a couple of steps towards the older man, causing him to move back a couple of

2

steps.  Ramos then saw the teenager punch the older male.[1]  He agreed that he lost sight of both men while he parked his vehicle, and because the teen had his back to Ramos, he did not have an unobstructed view of the older male.  Both the teen and the older male then fell.  About ten seconds later, the three teens began walking away, and later broke into a run.  The teen who was involved in the actual fight was the tallest of the three teens.  Mr. Ramos circled around with his car, saw that the older male was on the ground apparently seizing, and he called 911.  Later at the police station, Mr. Ramos picked out a picture of Appellant as one of the teens, but qualified the identification: Appellant was "one of the guys that was in the group but not sure."

Laura Mena was also westbound on Trowbridge that afternoon.  She saw a confrontation between three younger males and one older male.  She made a U-turn to come back and by the time she parked and got out of her car, the three younger males were already walking down the street.  The older male was on the ground apparently seizing and she also notified 911.  She called out to the youths to come back, but the tallest of the three threw his hand up in the air and pointed his index finger skyward.

Erin Lile was driving eastbound on Trowbridge at that time.  She saw what looked like an after-school fight.  Two males were in close proximity and facing each other in an apparent verbal confrontation.  She continued to observe as she drove by, and was eventually looking at the events through her rear view mirror.  She saw arm movements, and the two broke away from each other, separating apart in distance.  The younger male then "bum rushed" the older man, which Lile described as one person running into the chest of another.  This lifted the older man off his feet and forced him to the ground.  She then saw the younger man get on top of and "pummel" the older man (which she described as punching him in the face repeatedly).  Lile

---

[1] In a statement to the police, Mr. Molina wrote, "I did not see either of them hit each other" but at trial he explained that statement only pertained to what happened after both the teen and older male had fallen down.

made a U-turn and stayed at the scene until the police arrived. The older man was making a snoring sound but was attempting to get up. His forehead was knotted up and his whole face was "blown up." She also saw the three youths walk away from the scene.

### The Participant's Version of Events

The three younger males referenced above included Appellant, then age 17, Tony Gomez, age 18, and Alan Medrano, age 19. Appellant stood 6'2" and easily was the tallest of the three youths. The older male was El Paso Police Officer Jonathan Molina.[2] He stood six feet tall and weighed 275 pounds. At trial, Alan Medrano testified for the State, but as a hostile witness. As we note below, his trial testimony strayed at times from a written and videotaped statement that he gave shortly after the incident. Appellant also testified to the events of that day. The other youth, Tony Gomez, invoked his right not to incriminate himself and was never questioned in front of the jury. We recount Alan Medrano and Appellant's testimony as presented to the jury.

#### *Alan Medrano*

Alan Medrano, Tony Gomez, and Appellant were walking home from school and were all friends of each other. As they were walking along the sidewalk on Trowbridge, Medrano noticed that Tony Gomez had a piece of metal and was scratching a car. Gomez scratched another car, which turned out to be Officer Molina's. As they were crossing the street, Officer Molina came out of a house and yelled at them to come back. He testified that Molina was mad

---

[2] Officer Molina was not in uniform and according to the testimony did not immediately identify himself as a police officer to the youths. There was considerable dispute below as to whether Officer Molina was in the performance of his duties, and whether Appellant knew Officer Molina to be a police officer, both of which were predicate elements for the capital murder charge. TEX.PENAL CODE ANN. § 19.03(a)(1). The jury did not return a guilty verdict on the capital murder charge and whether the Officer was or was not killed in the performance of his duties is not before us. We refer to Jonathan Molina as "Officer Molina" only as an aide to the reader in identifying the participants.

4

and aggressive. Medrano originally told the police, however, that Officer Molina was not mad and just yelled "Hey bro." The three ignored him and kept walking.

When they were in the next block down, Officer Molina then pulled up beside them in his car. Officer Molina confronted Gomez, saying "What's up, now, bitch? Why are you scratching my car?" Gomez denied he did so and the two argued until Officer Molina started to curse at Gomez, referring to him as a "little kid" and a "fag." While both Appellant and Medrano testified that Officer Molina used the word "fag" (and Appellant also recalled him using the word "faggot"), Medrano's statements to the police never included that pejorative. Officer Molina continued to accuse Gomez of scratching his car and Gomez continued to deny it.

Appellant then got in between Officer Molina and Gomez. Appellant first tried to calm the situation by telling Officer Molina to "chill out."[3] But they started arguing and got progressively closer to each other. At one point, Officer Molina told Appellant and Medrano to leave, but Appellant replied that it was a public sidewalk. As the argument progressed, Officer Molina then identified himself as a police officer but when Appellant asked to see a badge, Officer Molina responded, "I don't have to show you shit." Medrano's prior statement to the police, however, indicated that when Appellant asked to see Molina's badge, Molina told an elderly woman sitting on the porch of an adjacent house to "call the cops, call the police."[4]

The argument continued with Officer Molina and Appellant being about three inches from each other, nose to nose, until Officer Molina pushed Appellant with his shoulder. At trial Medrano testified that Appellant responded immediately by hitting Officer Molina. But Medrano also acknowledged that in his earlier police statement, he stated that Officer Molina

---

[3] He was also reported to say, "Calm down, dude, you know, like, we don't want to have any problems"; "You are coming and cussing at us saying that we did this, and we didn't do anything"; "calm down"; and "chill the fuck out."

[4] The woman did not testify as she passed away before trial.

had turned his attention away from Appellant and began to yell at Gomez, when Appellant "hit him, because he got mad."

Medrano testified that after being hit, Officer Molina raised his hands "like he was ready to fight" and Appellant hit him again. Medrano had not made this claim in his police statement. Then according to Medrano, Appellant took Officer Molina down by "kind of trip[ing] him." As Medrano explained it: "That's when [Appellant] picked him up from the legs and dropped him." He also described the take down as a tackle.

When Officer Molina went to the ground, Appellant went down next to him and then got on top of Officer Molina, punching him two or three times in the face. At trial, Medrano testified that Officer Molina was putting his hands up as Appellant was hitting him but his earlier statement had also not mentioned that fact. When Officer Molina stopped responding, or possibly at the urging of his friends, Appellant broke off and got up. Medrano told the police that Officer Molina looked "stiff" and was just lying there with his eyes closed.

The three youths walked to end of the block, ignoring the call of someone to come back, and then they started to run. Medrano testified that Appellant was "really, really mad," as Officer Molina had "really pissed [him] off." Appellant had complained to Medrano that Officer Molina was yelling at him for no reason, cussing at him, that and Officer Molina was not his father, and was "no one to be yelling at him like that." .

Medrano was apprehended by the police within ten minutes of the event.

### *Appellant's testimony*

Appellant similarly described walking home from school with his friends. As they were walking along Trowbridge, he claimed that Officer Molina came out of his house and first called out, "You fucking faggots." The three youths ignored him and kept walking. When Officer

6

Molina soon pulled up alongside them in his car, Molina got out appearing "very angry" and yelled at Gomez, "Hey, you fucking faggot," and asked, "Why the fuck did you scratch my car?" Gomez denied doing anything and Gomez and Officer Molina began arguing, which grew heated with the continued use of profanity. At that point, Appellant stepped in and pulled Gomez back, telling both to "calm down."

Officer Molina then turned to Appellant and started "cussing" at him.[5] Appellant then said just let us go home. He felt Officer Molina was "real aggressive" making comments and threats that caused Appellant to be afraid for himself and his friends. Even though Appellant was the taller of the two, Officer Molina was considerably stockier. Appellant agreed he also got upset and used "vulgar" language.

The two had gotten within inches of each other and Officer Molina was saying, "Get out of here. Get the fuck out of here. You have nothing to do here. This is not your business. Just leave, you little punk." At that point, Officer Molina first mentioned that he was a police officer, prompting Appellant to ask to see his badge. Officer Molina said, "I don't have to show you shit" and said to an older woman who was witnessing the exchange from a nearby porch that she should "call the cops." The argument continued and Appellant told Officer Molina he was seventeen years old and "you can't hit me" to which Officer Molina supposedly responded, "I don't care how old you are, I could kick your ass and the rest." Appellant claimed that Officer Molina then shoved him with his right hand. Appellant responded immediately by hitting Officer Molina twice.

Seeing Officer Molina's expression after the punches, Appellant got more scared and grabbed him and pushed him to the ground. He described the take down as grabbing "him from

---

[5] "He engages with me. He starts cussing at me asking me, Who am I? Who the hell do I get to tell him what to do? Who the fuck am I? What am I doing there?" He was also claimed to say, "Fuck you. You bitch. Get the hell out of here."

7

the legs and then [I] just pushed him to the floor." They both went down and Appellant fell on top of Officer Molina who was using his legs to kick Appellant off. Appellant hit Officer Molina twice who then "stopped fighting back." The entire fight lasted no more than ten seconds. ) The teens then walked away and began talking about planning a birthday party, but by the time they got the end of the street, they heard someone was going to call the police, and they broke into a run.

Appellant testified that when got up and left the scene, it looked like Officer Molina was trying to get up and gather himself. In a Facebook post that Appellant made later that evening, however, he described Officer Molina as "twitching and bleeding." This latter description was likely more correct. Officer Molina had a severe contusion to the back of the head consistent with an uninterrupted fall. The fight took place in an area where the concrete was irregular, having bumps, cracks, and a place where it jutted up like a teepee. Officer Molina's skull was fractured from the back extending over the skull cap to the left frontal area. He suffered a contra-coup brain injury; the immediate impact injured the rear part of the brain and the frontal lobes were injured as the brain rebounded forward. Officer Molina died ten days later from a subarachnoid hemorrhage that led to brain swelling which shut down his other bodily functions. Dr. Juan Contin, the coroner, testified that any injuries from the punches had nothing to do with the cause of death, but the blow to the back of the head was an unsurvivable injury.

Appellant told the jury he never meant to kill Officer Molina, and that he only got in the fight because he feared for himself or his friends. The State elicited some additional background testimony about Appellant. When Medrano was fourteen or fifteen years old, he had trained five or six months at a boxing gym and had passed along some of his knowledge to Appellant. Conversely, Appellant showed Medrano a few Judo moves that he learned years before from two

8

to three months of classes that he had taken. One of the moves involved taking a person down by grabbing their legs, picking them up, and using their own force against them. The two would practice and teach each other these skills two to three times a week.

### The Facebook Messages[6]

After the fight, Appellant went to an uncle's apartment. He then began sending and receiving messages on Facebook. Several of the messages recounted his use of ecstasy earlier in the day. Many of his messages were focused on the fight. He messaged his girlfriend that he might go to jail because he and "two friends walked home and this guy starting talking shit to us, and at first I told him to back off and he pushed me so I punched him, then tackled him, then punched him again . . . [.]" He also messaged his girlfriend that "It's not my fault tho he was like 30 and twice my size, me either babe I'm really really really scared" and "I shouldn't have hit him, I don't know what I was thinking[.]" He told his girlfriend they ran when they saw the man twitching and bleeding. As he heard news accounts of the event, he also messaged Medrano, who by this time was in police custody, that: "I hope u didn't get caught I killed the guy, he went into compulsions and died." He claims he sent this message after he had heard on the news that Officer Molina had passed, but when later news accounts reported he was alive at the hospital, Appellant messaged Medrano that: "Haha jk Weii I seen that shit on the news" and "Dude turn on the news dude there's all this crap going on." Appellant claimed that he was going to turn himself the next day, but the police located and arrested him at 3:00 a.m. the next morning.

---

[6] We set out many of the posts in this opinion and to avoid distraction, we have chosen to omit the many [sic] signals that would ordinarily be used to denote original grammatical, punctuation, and spelling errors. The original exhibit was produced from Facebook in a form showing the author, recipient, date of the message, as well as the text message. Some of the messages also included "emojis" but on the exhibits, the emoji is represented by specific key strokes, such as >.< and (/.\). Neither party has placed any emphasis on the significance of the emojis and we have not reproduced them in this opinion.

## PROCEDURAL HISTORY

The jury was given the choice to convict or acquit Appellant on capital murder, murder, manslaughter, or criminally negligent homicide. The charge included Appellant's theory of self-defense. The jury found Appellant guilty of murder. Following punishment phase testimony, the jury assessed a fifty-year sentence.

Appellant first appealed his conviction to this Court, raising fifteen issues. Three of those issues challenged the legal sufficiency of the evidence. We resolved Issue Four against Appellant--that issue contended that the State failed to prove that Appellant did not act in self-defense. *Gonzalez*, 2017 WL 360690, at *7. The other two legal sufficiency challenges contend there was insufficient evidence to prove either that Appellant intentionally or knowingly caused Molina's death (Issue Two) or that he intended to cause serious-bodily-injury and committed an act clearly dangerous to human life (Issue Three). We did not resolve those issues other than to say neither would result in an acquittal, because there was at least evidence of a lesser included offense (i.e. manslaughter or criminally negligent homicide). *Gonzalez*, 2017 WL 360690, at *12. We concluded that the case needed to remanded for a new trial based on Issues Thirteen and Fourteen, which challenged the admission of evidence of Appellant's use and possession of ecstasy pills. *Id.* at 11.

The Texas Court of Criminal Appeals agreed that the admission of that evidence was error, but also concluded that the error was harmless. *Gonzalez*, 544 S.W.3d at 375. It has remanded the case for our consideration of the remaining issues, which include: the legal sufficiency challenges (Issues Two and Three); restricting Appellant's voir dire on self-defense (Issue One); including serious-bodily-injury as a means to commit murder in the charge (Issues Five and Six); allowing twenty-eight uniformed military officers to attend closing argument

10

(Issue Seven and Eight), improper jury argument by the State's prosecutor (Issues Nine, Ten, Eleven, and Twelve); and cumulative error (Issue Fifteen).

## SUFFICIENCY OF THE EVIDENCE

In Issues Two and Three, Appellant contends the evidence is legally insufficient to support the conviction. By statute, a person can commit murder either by (1) "intentionally or knowingly" causing a death, or (2) intending to cause "serious bodily injury" through an act "clearly dangerous to human life that causes the death of an individual." TEX.PENAL CODE ANN. § 19.02(b)(1), (2). Intentionally or knowingly causing a death is criminalized under Section 19.02(b)(1) and serious-bodily-injury murder under Section 19.02(b)(2). *Id*. Appellant's second issue challenges whether the State proved that he intentionally or knowingly caused Officer Molina's death and his third issue challenges the Section 19.02(b)(2) serious-bodily-injury murder theory.[7]

## **Standard of Review**

Evidence is legally sufficient when, viewed in the light most favorable to the verdict, *any* rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 912 (Tex.Crim.App. 2010)(establishing legal insufficiency under *Jackson v. Virginia* as the only standard for review of the evidence).

The jury is the sole judge of credibility and the weight attached to the testimony of each witness. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex.Crim.App. 2014). It is the fact finder's duty

---

[7] In a footnote, the State claims that these issues are forfeited because they were inadequately briefed. The State concedes that Appellant has set out the legal authorities with the appropriate standard of review, but faults Appellant for failing to cite any legal authorities in his argument under each issue. While the resolution of legal insufficiency challenges from other reported cases can at times be helpful, each case is ultimately based on its own facts. *Sadler v. State*, 364 S.W.2d 234, 238 (Tex.Crim.App. 1963). We decline, therefore, to hold Appellant forfeited the challenge simply because he elected not to cite to that kind of authority.

11

"to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007), *quoting Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. The jury also may choose to believe or disbelieve that testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex.Crim.App. 2008); *Belton v. State*, 900 S.W.2d 886, 897 (Tex.App.--El Paso 1995, pet. ref'd). When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict, and we defer to that determination. *Dobbs*, 434 S.W.3d at 170; *see also Jackson*, 443 U.S. at 319, 99 S.Ct. at 2781.

Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone may be sufficient to establish guilt. *Dobbs*, 434 S.W.3d at 170; *Carrizales v. State*, 414 S.W.3d 737, 742 n.20 (Tex.Crim.App. 2013). Each fact need not point directly and independently to the guilt of the defendant, so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Dobbs*, 434 S.W.3d at 170; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007).

We remain mindful that "[t]here is no higher burden of proof in any trial, criminal or civil, and there is no higher standard of appellate review than the standard mandated by *Jackson*." *Brooks*, 323 S.W.3d at 917 (Cochran, J., concurring). However, "[w]e are not to sit as a thirteenth juror reweighing the evidence or deciding whether we believe the evidence established the element in contention beyond a reasonable doubt[.]" *Blankenship v. State*, 780 S.W.2d 198, 207 (Tex.Crim.App. 1988). Instead, "we test the evidence to see if it is at least conclusive enough for a reasonable factfinder to believe based on the evidence that the element is established beyond a reasonable doubt." *Id*., *citing Jackson*, 443 U.S. at 318.

**The State's Burden**

12

We begin with what the State needed to prove by measuring the evidence against the elements of the offense as defined in a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex.Crim.App. 2009). To convict Appellant of murder as alleged in the indictment, the jury was required to find that Appellant intentionally or knowingly caused Officer Molina's death, or that Appellant intended to cause serious-bodily-injury by committing an act clearly dangerous to human life (here grabbing him about the legs, causing him to strike his head on the ground).

Murder, under Section 19.02(b)(1) or (b)(2), is a "result of conduct" offense, which requires that the culpable mental state relate to the result of the conduct--that is--causing of the death. *See Cavazos v. State,* 382 S.W.3d 377, 384 (Tex.Crim.App. 2012)(so stating for Section 19.02(b)(2)); *Roberts v. State,* 273 S.W.3d 322, 328-29 (Tex.Crim.App. 2008)(so stating for Section 19.02(b)(1)). A person acts "intentionally" with respect to a result of his conduct when it is his conscious objective or desire to cause the result. *See* TEX.PENAL CODE ANN. § 6.03(a). A person acts "knowingly" with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

Murder under Section 19.02(b)(1) focuses on the intent to take a life and does not impose any limitation on the manner and means by which the life is taken. *Lugo-Lugo v. State*, 650 S.W.2d 72, 80-82 (Tex.Crim.App. 1983). Thus if the defendant intentionally or knowingly intends to take a life and does so by "throw[ing] a small stone at an individual and kills him, the perpetrator is guilty of murder not withstanding that the act resulting in the death was not *clearly dangerous to human life*." [Emphasis in original]. *Id*. A Section 19.02(b)(2) serious-bodily-injury murder theory is still a result of conduct offense, but also focuses on the means and manner of the act causing the death. *Id*. Under Section 19.02(b)(2) the State must show: (1) the

defendant intends to cause serious bodily injury*;* (2) commits an act clearly dangerous to human life; that (3) causes the death of an individual. The *Lugo-Lugo* court explained the two-fold burden on the State. First, the State must prove the defendant acted with the conscious objective or desire to create a substantial risk of death, serious permanent disfigurement, or protracted loss or impairment of any bodily member or organ which in turn caused the death of an individual. *Id.* at 81. Next, the State must also show the individual committed an act clearly dangerous to human life. This second element is measured by an objective standard. *Id.*

The State is not required to produce direct evidence of the requisite culpable mental state. *Hart v. State*, 89 S.W.3d 61, 64 (Tex.Crim.App. 2002). In fact, the requisite culpable mental state is almost always proved circumstantially. *See Hernandez v. State*, 819 S.W.2d 806, 810 (Tex.Crim.App. 1991)("[M]ental culpability is of such a nature that it generally must be inferred from the circumstances under which a prohibited act or omission occurs."). Accordingly, intent may be inferred from the acts, words, and conduct of the accused. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex.Crim.App. 2004); *Manrique v. State*, 994 S.W.2d 640, 649 (Tex.Crim.App. 1999). Intent can also be inferred from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex.Crim.App. 1995); *Duren v. State*, 87 S.W.3d 719, 724 (Tex.App.--Texarkana 2002, pet. struck). The jury may consider events occurring before, during, or after the offense. *Henderson v. State*, 825 S.W.2d 746, 749 (Tex.App.--Houston [14th Dist.] 1992, pet. ref'd).

### Intentional and Knowing Murder (Section 19.02(b)(1))

In a sufficiency challenge, "each case must necessarily turn upon its own facts, and prior cases are only useful to determine the dividing line." *Sadler v. State*, 364 S.W.2d 234, 238

14

(Tex.Crim.App. 1963). We start with a couple of lines of demarcation from two early opinions from the Texas Court of Criminal Appeals. In *Watson v. State*, 189 S.W.2d 1020 (Tex.Crim.App. 1945) two adult men got into an argument over damage to an automobile. After being called a liar, the defendant hit the victim "two or three licks." *Id*. at 1020. The victim immediately went down and died later that day from a concussion. The defendant and victim were of comparable age and size. As here, the defendant claimed to have acted in his own self-defense and denied any intent to kill. With no other evidence of intent, the court found the evidence insufficient to support the murder conviction. *Id*. at 1021.

By contrast, in *Phillips v. State*, 216 S.W.2d 213 (Tex.Crim.App. 1948), another fist-to-cuffs altercation resulted in the affirmance of the murder conviction. There, the defendant and victim went out drinking on a rural road. *Id*. at 214. A fight ensued in which the defendant struck the victim three or four times in the head, leaving the victim helpless and in an unconscious, or semi-conscious state. Rather than seek assistance, the defendant dragged the victim to the edge of the road and left him lying there. Upon later learning the victim had died, the defendant then fled the jurisdiction. The court concluded that leaving the defendant helpless "show[ed] such a disregard for human life as would justify the jury's conclusion that he intended to kill the deceased." *Id*.

Appellant attempts to nestle himself closer to a fact pattern like *Sadler*, emphasizing the brevity of the fight, the lack of any prior relationship between the parties (and thus motive), or contemporaneous statement evidencing an intent to murder. Appellant also notes the death blow here was the un-fortuitous impact of Officer Molina's head on the pavement, which might just as easily have occurred from an accidental fall. Conversely, the State responds by pointing to several facts which it claims allowed the jury to infer that Appellant intentionally or knowingly

15

killed Officer Molina, including the nature of the injury, Appellant's continued assault on a helpless person, his failure to assist Officer Medrano once injured, his flight from the scene, and cavalier social media posts.

First, the State focuses on the nature of the injury, here a significant and unsurvivable head injury. While there is little doubt the injury was severe, and resulted in Officer Molina's death ten days later, the coroner testified that the fatal injury resulted from the single impact when Officer Molina fell to the ground. The force created by his own body weight would have been sufficient to cause the injury. There is nothing unique to the injury itself that demonstrates intent.

More important for the State is the evidence that Appellant got on top of Officer Molina and continued to hit him (two or three times) after he was on the ground. Although the evidence was disputed, the jury could have believed that Appellant took an affirmative action in getting on top of Officer Molina, and that Molina was unconscious and helpless at the time. The jury also had testimony from which it could have believed that Appellant only stopped hitting Officer Molina when his friends told him to stop. Evidence of striking a helpless victim raises an inference that a fatal blow was struck intentionally or knowingly. *Hall v. State*, 970 S.W.2d 137, 140 (Tex.App.--Amarillo 1998, pet. ref'd)(repeated hitting and kicking of victim while on the ground and unable to defend himself was one of several facts supporting sufficiency of murder conviction).

And like the defendant in *Phillips*, Appellant left the scene when some testimony supported the view that Officer Molina showed signs of a serious injury. When a bystander asked him to return, Appellant responded with finger gesture skyward. A later Facebook message supports the inference that Appellant knew that Office Medrano was seriously hurt.

16

Appellant counters that because there were other people in the area, he could have assumed that Officer Molina would be cared for. Yet Appellant had no basis to know the bystanders' competence or willingness to assist the downed man.

The State also presented evidence of flight. Aside from leaving the scene, a Facebook post supports that Appellant knew that the police were looking for him that evening. He stayed inside his residence until the police arrested him. While flight alone will not support a guilty verdict, evidence of flight from the scene of a crime is a circumstance from which an inference of guilt may be drawn. *Holloway v. State*, 525 S.W.2d 165, 167 (Tex.Crim.App. 1975); *Samuels v. State*, 785 S.W.2d 882, 885 (Tex.App.--San Antonio 1990, pet. ref'd). Appellant claimed he left the scene because he thought he might get into trouble, as he had seen those involved in school fights, but the trier of fact was not required to accept his explanation for flight. *Taylor v. State,* 672 S.W.2d 262, 264 (Tex.App.--Waco 1984, no pet.).

Although the question is an exceedingly close one, we conclude that a rational jury could have found the necessary intent for an intentional and knowing murder. We overrule Issue Two.

### Serious Bodily Injury (Section 19.02(b)(2))

Much of what we have said as to intentional and knowing murder also supports an inference that Appellant intended to cause Officer Molina serious-bodily-injury. More relevant here is the circumstance of taking Officer Molina's legs out from underneath him on an irregular concrete surface. Appellant then hit him in the face while his head was against the ground. These actions raise at least an inference of acting with the conscious objective or desire to create a substantial risk of death through causing serious-bodily-injury.

One additional requirement for a serious-bodily-injury murder is that Appellant committed an act clearly dangerous to human life, as measured on an objective basis. *Lugo-*

17

*Lugo*, 650 S.W.2d at 81. No doubt people are often tackled to the ground, or otherwise fall, and suffer little or no injury. The question here, however, is whether undercutting someone's feet in such a way that they might fall without the ability to brace themselves, and fall on a hard-uneven surface, is an act clearly dangerous to human life. We conclude that a reasonable jury could have so found. We are not dealing with a student felled in a padded Judo studio, or a gridiron running back who is protected by padding and expecting a tackle. Given the testimony here, undercutting a six-foot tall person on an uneven concrete surface subjects the skull to over two hundred pounds of force, and as demonstrated by the actual injury here, can cause a grievous head injury.

We conclude that the evidence is sufficient to support a finding of serious-bodily-injury murder and overrule Issue Three.

## CHARGE ERROR

The State indicted Appellant for capital murder by intentionally and knowingly causing the death of Officer Molina by grabbing him about the legs and causing him to strike his head on the ground, all while Appellant knew Officer Molina was a peace officer acting in the lawful discharge of an official duty. Capital murder requires the State to prove a Section 19.02(b)(1) murder, along with at least one of the statutorily defined aggravating circumstances found in TEX.PENAL CODE ANN. § 19.03(a)(1)-(9). Relevant here, one of those aggravating circumstances is killing a peace officer who is lawfully discharging an official duty. *Id*. at § 19.03(a)(1). The jury charge included a verdict form and instructions for capital murder. It also included verdict forms and instructions for several lesser included offenses, including murder, manslaughter, and criminally negligent homicide. Instructions governing the lesser included charge of murder allowed the jury to find Appellant guilty either under Section 19.02(b)(1) or Section 19.02(b)(2).

18

In his fifth issue, Appellant faults the trial court for including serious-bodily-injury murder as a lesser included offense of capital murder. His sixth issue objects to the inclusion of a definition of serious-bodily-injury. He contends the indictment never raised that means of committing murder and that serious-bodily-injury murder is not a lesser included offense for capital murder. Conversely, the State contends that the indictment which alleged Appellant intentionally and knowingly caused the death of Molina by grabbing him about the legs, causing him to strike his head on the ground, also includes serious-bodily-injury murder as a lesser included offense. By proving that Appellant caused Molina's death intentionally or knowingly (as alleged in the indictment), the State would necessarily prove that Gonzalez intended to cause Molina serious-bodily-injury under Section 19.02(b)(2).

## Standard of Review

When a party challenges the charge, we first determine if there was error, and then analyze that error for harm. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex.Crim.App. 2005). If a defendant has properly objected to the claimed error the defendant must show "some harm" to his rights. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984). In assessing the degree of harm, we do so in light of the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information in the record as a whole. *Id*.

The dispute here turns on what is a lesser included offense. We apply a two part test for determining whether a trial court should instruct on a lesser included offense: (1) is the lesser included offense included within the offense charged, and if so, (2) is there some evidence that would permit a jury to rationally find that if a defendant is guilty, he is guilty only of the lesser offense. *Hall v. State*, 225 S.W.3d 524, 536 (Tex.Crim.App. 2007); *Rousseau v. State*, 855 S.W.2d 666, 672-73 (Tex.Crim.App. 1993). The first step is a question of law and does not

19

depend on the evidence raised at trial. *Hall*, 225 S.W.3d at 535. In this step, the court compares the statutory elements as alleged in the indictment with the elements of the lesser offense. *See Cavazos v. State*, 382 S.W.3d 377, 382 (Tex.Crim.App. 2012).

Relevant to that inquiry, Article 37.09 of the Texas Code of Criminal Procedure dictates that an offense is a lesser included offense if: "(1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charge;" or "(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission." TEX.CODE CRIM.PROC.ANN. art. 37.09 (1),(3). The Texas Court of Criminal Appeals dictates that we use the cognate-pleadings approach to determine whether an offense qualifies as a lesser included offense under Article 37.09(1). *Hall*, 225 S.W.3d at 535. The court's 2007 opinion in *Hall* adopted this approach, noting some of its earlier opinions had been conflicting and had applied differing approaches. *Id.* at 530-31. In *Ex parte Watson*, 306 S.W.3d 259, 271 (Tex.Crim.App. 2009)(op. on reh'g), the court went one step further to make explicit what implicitly followed from *Hall*:

> An offense is a lesser-included offense of another offense, under Article 37.09(1) of the Code of Criminal Procedure, if the indictment for the greater-inclusive offense either: (1) alleges all of the elements of the lesser-included offense, or (2) alleges elements plus facts (including descriptive averments, such as non-statutory manner and means, that are alleged for purposes of providing notice) from which all of the elements of the lesser-included offense may be deduced. Both statutory elements and any descriptive averments alleged in the indictment for the greater-inclusive offense should be compared to the statutory elements of the lesser offense. If a descriptive averment in the indictment for the greater offense is identical to an element of the lesser offense, or if an element of the lesser offense may be deduced from a descriptive averment in the indictment for the greater-inclusive offense, this should be factored into the lesser-included-offense analysis in asking whether all of the elements of the lesser offense are contained within the allegations of the greater offense.

*Id.* at 273. The elements of the lesser included offense do not have to be pled in the indictment if they can be deduced from facts alleged in that indictment. *Cavazos*, 382 S.W.3d at 382.

20

As *Cavazos* further explains, we may include functional equivalence as part of our lesser included offense analysis. *Id.* at 383. Using functional equivalence, we "examine the elements of the lesser offense and decide whether they are functionally the same or less than those required to prove the charged offense." *McKithan v. State*, 324 S.W.3d 582, 588 (Tex.Crim.App. 2010), *citing Farrakhan v. State*, 247 S.W.3d 720, 722-23 (Tex.Crim.App. 2008).

### Analysis

The relevant statutory elements for capital murder as alleged in the indictment are that Appellant:

(1) intentionally and knowingly;

(2) caused the death of Officer Molina by grabbing him about the legs, causing him to strike his head on the ground;

(3) that Officer Molina was acting in the lawful discharge of an official duty;

(4) Appellant knew Officer Molina to be a police officer.

The statutory elements for serious-bodily-injury murder under Section 19.02(b)(2) are that Appellant:

(1) with intent to cause serious bodily injury to an individual;

(2) committed an act clearly dangerous to human life (here by grabbing him about the legs, causing him to strike his head on the ground);

(3) which caused the death of Officer Molina.

Article 37.09(1) then poses this question: Are the elements of Section 19.02(b)(2) murder established by proof of the same or less than all the facts required to establish capital murder? Or alternatively, Article 37.09(3) asks if the elements differ only to the extent that a less culpable mental state suffices to establish its commission?

The Houston Fourteenth Court faced this same question in *Cannon v. State*, 401 S.W.3d 907 (Tex.App.--Houston [14th Dist.] 2013, pet. ref'd). In that case, the defendant was indicted for capital murder by intentionally and knowingly shooting two persons. *Id*. at 909. Killing more than one person in the same episode is another of the predicate circumstances which might elevate murder to capital murder. TEX.PENAL CODE ANN. § 19.03(a)(7). The jury, however, found the defendant guilty of killing only one person, and the jury answered affirmatively to the lesser included charge of murder. Like the charge here, the instructions allowed the jury to find the defendant guilty of murder either under a Section 19.02(b)(1) intentionally or knowingly theory, or a 19.02(b)(2) serious-bodily-injury theory. And as here, the defendant in that case claimed that the Section 19.02(b)(2) serious-bodily-injury murder was not a lesser included offense for capital murder because Section 19.02(b)(2) requires proof of different elements. *Id*. at 909.

The Houston court disagreed, reasoning that proof that a person intentionally and knowingly caused the death of two persons by shooting them would also prove that the person intended to cause serious-bodily-injury to each person. *Id.* at 911. The Penal Code defines "serious bodily injury" as "bodily injury that creates a substantial risk of death *or that causes death*." [Emphasis added]. TEX.PENAL CODE ANN. § 1.07(a)(46). Because death is the ultimate serious-bodily-injury, proof that a defendant intentionally and knowingly caused the death of a person also proves that the defendant intended to cause serious-bodily-injury. Additionally, the *Cannon* court reasoned that intentionally and knowingly killing a person by shooting them with a firearm also necessarily proved committing an act clearly dangerous to human life. *Id.* "Simply put, the facts alleged in the capital murder indictment, if established, would also prove the lesser-included offense of murder." *Id.*

22

We agree with the reasoning of the *Cannon* court. If Appellant intentionally and knowingly killed Officer Molina by taking him down the ground so as to cause a blow to the back of the head, he also caused serious-bodily-injury. If taking one to the ground on their head can cause their death as alleged in the indictment, the same act is clearly dangerous to human life. The descriptive averment in the indictment would therefore put Appellant on notice of the Section 19.02(b)(2) serious-bodily-injury means for committing murder. *See also Hudson v. State*, 394 S.W.3d 522, 523, 525 (Tex.Crim.App. 2013)(stating that murder based on intent to cause serious-bodily-injury was one of three possible lesser included offense of capital murder).

Appellant argues from a series of cases that just because the evidence at trial might show the elements of the greater offense overlap the lesser offense, the relevant test focuses only what the State is *required* to prove. *See e.g. McKithan*, 324 S.W.3d at 589 (and cases discussed therein). But this line of cases is inapposite, because we need not look at the record to discern what the State actually proved, and in fact we are prohibited from doing so. It is enough to compare the definitions in the Penal Code for terms such as serious-bodily-injury, and the allegations in the indictment, to understand whether the statutory elements overlap. The two crimes here are the functional equivalent of each other given the descriptive averments in the indictment.

Appellant also argues through a reply brief that the inclusion of the Section 19.02(b)(2) theory denied him fair notice of the charge asserted because the indictment never contained that theory. A criminal defendant is of course entitled to fair notice of the specific charged offense. U.S. Const. amend. VI; Tex. Const. art. I § 10. Accordingly, the State is bound by the allegations in the charging instrument. *See Crenshaw v. State*, 378 S.W.3d 460, 465 (Tex.Crim.App. 2012); *Doyle v. State*, 661 S.W.2d 726, 729 (Tex.Crim.App. 1983).

23

In this regard, Appellant relies on *Plunkett v. Estelle*, 709 F.2d 1004, 1009-10 (5th Cir. 1983), *cert. denied*, *McKaskle v. Plunkett*, 465 U.S. 1007, 104 S.Ct. 1000, 79 L.Ed.2d 233 (1984). In that case, the defendant was indicted for intentionally and knowingly murdering an infant. The jury charge, however, included the alternate theory that he committed the murder by causing serious-bodily-injury. When his conviction was appealed through the Texas appellate system, the Texas Court of Criminal Appeals agreed that the Section 19.02(b)(2) serious-bodily-injury murder as included in the charge was erroneous and confusing. *Plunkett v. State*, 580 S.W.2d 815, 823 (Tex.Crim.App. 1978)(op. on reh'g).[8] Nonetheless, the court held under the particular wording of the charge, the defendant had not shown fundamental error (as there was no objection to the charge at trial). *Id*. at 821-23. On a federal writ of habeas corpus, the Fifth Circuit disagreed in part with the court of criminal appeals and based on the record before it concluded the error was harmful. 709 F.2d 1009-10. The federal court accepted the premise that an indictment alleging a Section 19.02(b)(1) murder does not provide notice of a Section 19.02(b)(2) theory. *Id*.; *see also Stewart v. State*, 591 S.W.2d 537, 537-38 (Tex.Crim.App. 1979).

*Plunkett*, however, decided the question of whether an indictment for one means of murder places the defendant on fair notice of another means for committing murder. It did not decide whether one offense is a lesser included offense of a higher charge. Here, Appellant was indicted for capital murder. As such he was placed on fair notice in a constitutional sense of any lesser included offense from the highest charged offense. *Fransaw v. Lynaugh*, 810 F.2d 518, 529 (5th Cir.), *cert. denied,* 483 U.S. 1008, 107 S.Ct. 3237, 97 L.Ed.2d 742 (1987). And even if *Plunkett* implicitly addresses what is a lesser included offense, it did so without the guidance that

---

[8] The statutory references in the opinion refer to Section 19.02(a)(1) and (2), because at the time, subsection (a) contained the intentional/knowing and serious-bodily-injury means for murder.

the Texas Court of Criminal Appeals has more recently developed in *Hall* and *Watson*, with the evolution of the cognate pleading analysis.

The second prong of the lesser included analysis asks whether there is some evidence that would permit a rational jury to find that, if Appellant is guilty, he is guilty only of the lesser offense. *Cavazos*, 382 S.W.3d at 383; *Hall*, 225 S.W.3d at 536. Appellant here contends there is no evidence that he intended to cause serious-bodily-injury, and thus even if the Section 19.02(b)(2) theory is included, it would not be warranted in this case. For this second prong, we consider the evidence presented during trial. *Cavazos*, 382 S.W.3d at 383. But this second inquiry returns us to the sufficiency of the evidence challenge, and as already set out, we find legally sufficient evidence to support the verdict based on serious-bodily-injury murder. Issues Five and Six are overruled.

## VOIR DIRE

In his first issue, Appellant contends that he was prohibited from discussing with the panel self-defense unless he included a discussion of a portion of self-defense law not applicable to the case.

Self-defense as a justification is described in TEX.PENAL CODE ANN. § 9.31. Section 9.31(a) first provides that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id*. But the defense in subsection (a) is expressly made subject to several exceptions found in subsection (b). That subsection defines five situations where the use of force against another would not be justified. *Id.* at (b)(1)-(5). One of those involves the use of force "to resist an arrest or search that the actor knows is being made by a peace officer . . . even though the arrest or search is unlawful, unless the resistance is

25

justified under Subsection (c)[.]" *Id.* at (b)(2). Section 9.31(b)(2)'s exception is subject to its own exception, as found in subsection (c) which reads:

> (c) The use of force to resist an arrest or search is justified:
>
> (1) if, before the actor offers any resistance, the peace officer (or person acting at his direction) uses or attempts to use greater force than necessary to make the arrest or search; and
>
> (2) when and to the degree the actor reasonably believes the force is immediately necessary to protect himself against the peace officer's (or other person's) use or attempted use of greater force than necessary.

*Id.* at § 9.31(c).

In voir dire, Appellant's counsel posed several questions to one prospective juror about the right of a person to defend himself or others. Counsel then began to quote "in the legal words, the law of self-defense" and tracked the language from Section 9.31(a). The State then objected and insisted that if counsel was to voir dire on self-defense, he needed to include the law as it pertains to confronting a police officer because "[i]t's completely different." The State claimed that not including the exception in Section 9.31(b)(2) would leave a "false impression" with the panel. The State, which had not done any voir dire on self-defense, insisted that it was "all or nothing."

Appellant's counsel responded that the exception did not apply because Officer Molina was not executing a search or affecting an arrest. He declined to voir dire on theories raised by the State. The State alternatively asked the Court to instruct the jury on self-defense. The trial judge declined that invitation and told Appellant's counsel that "You can go into the laws of self-defense as long as you talk about the whole area of law, not just part of it" Appellant's counsel then stated "I'm not going to go into any more self-defense because the Court's ruling that they wanted me to basically put out the State's theory of its case into my voir dire." Later, Appellant

26

in a bill outlined the types of questions that he would have asked had he been allowed to voir dire on self-defense.

The jury charge included the general proposition of self-defense from Section 9.31(a). It never included the exception, nor the exception to the exception from Section 9.31(b)(2) and (c). The State did not object to the charge as given, and there is no indication in our record that the State ever asked for an instruction on the Section 9.31(b)(2) exception.

## Standard of Review

We review the trial court's limitations on counsel's voir dire for an abuse of discretion. *See Barajas v. State*, 93 S.W.3d 36, 38 (Tex.Crim.App. 2002). The trial court may impose reasonable restrictions on exercising voir dire examination. *Thompson v. State*, 267 S.W.3d 514, 517 (Tex.App.--Austin 2008, pet. ref'd), *citing Boyd v. State*, 811 S.W.2d 105, 115 (Tex.Crim.App. 1991). The trial court abuses its discretion when it limits a proper question concerning a proper area of inquiry. *Dinkins v. State*, 894 S.W.2d 330, 345 (Tex.Crim.App. 1995). Generally, if a question seeks discovery of a potential juror's views on any issue relevant to the case, it is proper. *Sells v. State*, 121 S.W.3d 748, 756 (Tex.Crim.App. 2003); *Barajas*, 93 S.W.3d at 38. However, the trial court has "discretion to restrict voir dire questions that are confusing, misleading, vague and broad, or are improper commitment questions." *Hernandez v. State*, 390 S.W.3d 310, 315 (Tex.Crim.App. 2012), *citing Barajas*, 93 S.W.3d at 38-39.

## Analysis

Inquiries into the justification of self-defense were clearly a proper line of voir dire questioning. The State does not contend otherwise. Rather, the State contends that a defendant is not entitled to ask questions in any particular form. *See Wright v. State*, 28 S.W.3d 526, 534 (Tex.Crim.App. 2000), *citing Howard v. State*, 941 S.W.2d 102, 110-11 (Tex.Crim.App. 1996)

(op. on reh'g), *overruled in part on other grounds by Easley v. State*, 424 S.W.3d 535 (Tex.Crim.App. 2014). Thus, when the trial court excludes a question due to its form, but "does not place an absolute limitation on the substance of an appellant's voir dire question," the party is required to attempt to rephrase the question, or he will "risk waiver of the alleged voir dire restriction." *Hernandez*, 390 S.W.3d at 315; *see Howard*, 941 S.W.2d at 108-11; *Bolden v. State*, 73 S.W.3d 428, 431 (Tex.App.--Houston [1st Dist.] 2002, pet. ref'd). The State essentially argues here that Appellant must have complied with the trial court's directive to discuss the entire law of self-defense and failing to do so waived the error. We agree at least to the extent that the record does not show an abuse of discretion.

The trial court has the discretion to require improperly phrased questions to be properly reworded; failing to do so forfeits any claimed error. *Wright v. State*, 28 S.W.3d 526, 534 (Tex.Crim.App. 2000)("Although appellant is authorized to ask proper questions in a particular area of inquiry, he is not entitled to ask questions in any particular form. Because appellant did not follow through on this topic, we cannot say that the trial court improperly restricted his voir dire of this venire member."); *Howard*, 941 S.W.2d at 110-11 (where there is no absolute limitation placed on the underlying substance of a defendant's voir dire question, it is incumbent upon defense counsel to rephrase the improperly phrased query or waive the voir dire restriction); *Trevino v. State*, 815 S.W.2d 592, 600-01 (Tex.Crim.App. 1991), *rev'd on other grounds*, 503 U.S. 562, 112 S.Ct. 1547, 118 L.Ed.2d 193 (1992)(no error in restriction on voir dire pertaining to single question that could have been easily reworded); *Moncada v. State*, 960 S.W.2d 734, 737 (Tex.App.--El Paso 1997, pet. ref'd)(same). These cases are not precisely on point because Appellant never asked a specific question to which the trial court sustained an objection. Instead, Appellant was required under the trial court's ruling to "talk about the whole

28

area of law, not just part of it." Nonetheless, the deciding principal in these cases dictates the same outcome; Appellant needed to test the boundaries of exactly how far the trial court would have required Appellant to go in discussing the defense.

The trial court's ruling did not require Appellant to endorse the State's theory. And without actually attempting to meet the trial courts concerns, we cannot tell how the trial court would have required the specific inquires to be shaped. It may have required no more than a single statement paraphrasing Section 9.31(b)(2) and the exception to that exception. We might agree that Appellant was not required to do the State prosecutor's work. But without a record of what the trial court would have required, we are not convinced she abused her discretion in asking that the entire law, and not just a part of it, be explained to the panel.[9] Accordingly, we conclude the trial court did not abuse its discretion in restricting Appellant's voir dire on self-defense as it did. We overrule Issue One.

## OUTSIDE INFLUENCE

In Issue Seven, Appellant complains that the trial court erred in allowing some twenty-eight uniformed military personnel to sit in the courtroom during closing argument in the guilt innocence phase of the trial. In Issue Eight, he complains of the denial of his motion for new trial which additionally complained of several plaques hanging in the courtroom and courtroom office areas that honor the branches of the United States military. The trial court below is designated as a Veterans Court. Appellant contends the visitors and plaques impacted his case because there was some evidence before the jury that Officer Molina was a veteran.

---

[9] We are, however, sympathetic to the time constraints that counsel labored under. The State finished its voir dire at 12:52 a.m., and Appellant then began his voir dire an hour later. Appellant's counsel began discussing self-defense shortly before 4:00 p.m. After Appellant finished his voir dire, the trial court still needed to take up individual jurors for questioning, along with challenges for cause. The jury was eventually seated at 8:15 p.m. after an entire day of voir dire. Requiring Appellant to explain a non-applicable exception to the self-defense justification at length might have limited other topics he needed to address, or risk alienating prospective jurors who had been already spent the better part of a day listening to voir dire. Yet the explanation of Section 9.31(b)(2) may have only taken a sentence or two.

Well in advance of trial, the trial court invited military personnel from several foreign nations to observe American courtroom proceedings. The date that these uniformed personnel came fell on the morning of closing arguments in the guilt-innocent phase of this case. None of the military visitors were U.S. military service personnel. Appellant objected to the attendance of the uniformed officers. The trial court overruled the objection but also explained to the jury the presence of these visitors.[10]

A defendant has a constitutional right to be convicted only on the evidence presented at trial and not by outside influences. *Howard*, 941 S.W.2d at 117. But not every outside influence occurring during trial raises constitutional concerns. Sometimes defendants are guarded by uniformed peace officers in the jury's presence, and rarer still, some unruly defendants must be openly restrained. *Holbrook v. Flynn*, 475 U.S. 560, 568, 106 S.Ct. 1340, 1345, 89 L.Ed.2d 525 (1986). Occasionally an outburst by a spectator may be witnessed by the jury. To show that any of these outside influences require a new trial, a defendant must show either *inherent* or *actual* prejudice. *Howard*, 941 S.W.2d at 117; *In re E.A.*, 444 S.W.3d 203, 206 (Tex.App.--El Paso 2014, pet. denied).

Inherent prejudice is determined by looking to whether "an unacceptable risk is presented of impermissible factors coming into play." *Holbrook*, 475 U.S. at 569-70, 106 S.Ct. at 1346-47. In *Holbrook*, for instance, the Court found no inherent prejudice in having several uniformed peace officers seated behind the several defendants on trial. *Id*. Inherent prejudice rarely occurs

---

[10] The trial court explained:

> I do want to explain a couple of things to you-all before we get started. We do have some military guests here in the courtroom, in the gallery, as you have seen. Our guests are here from all over the world, from all the other countries. And so you can see by looking at them, they have their uniform and other things that indicate where they are from. They will be here just to observe part of the trial, and then they will be out sometime this morning to go off to another court. . . . I'm telling you that because they are here, but I'm also telling you that because they are here as guests. They have been set in my court for many months now, designated on this day. It just happened to fall on this day.

and is reserved for extreme situations. *Howard*, 941 S.W.2d at 117. For the other kind of prejudice--actual prejudice--we look to whether jurors actually articulated "a consciousness of some prejudicial effect." *Howard,* 941 S.W.2d at 117. Stated otherwise, spectator conduct will not result in reversible error unless a defendant shows "a reasonable probability that the conduct or expression interfered with the jury's verdict." *Id.* In *Howard*, the court found the defendant failed to demonstrate actual prejudice from twenty uniformed officers attending final argument (alongside some eighty non-police spectators) in a case involving an officer's death. *Id.* at 117. The defendant there presented no juror affidavits attesting to any awareness of the officers or effect of their presence. *Id.* at 117 n.12.

Appellant's complaint here is two-fold. Appellant first complains of the presence of the uniformed military personnel to which he timely objected at trial. In his motion for new trial, he joins an objection over the several plaques in the courtroom honoring the different branches of the United States military. He did not object to those plaques during trial and at a time when they could have been removed or covered had the trial court agreed they were prejudicial. We find any error regarding the plaques to be waived. TEX.R.APP.P. 33.1(a). Even were error not waived in that regard, the burden for showing harm for banners or displays in the courtroom would not be met on this record. *Cf. Torres v. State*, 109 S.W.3d 602, 605 (Tex.App.--Fort Worth 2003, no pet.)(defendant failed to show any prejudice from DWI posters in lobby of building in prosecution of DWI charge); *Aguilar v. State*, 08-09-00296-CR, 2011 WL 3807739, at *4 (Tex.App.--El Paso Aug. 26, 2011, no pet.)(not designated for publication)(same; *Camarillo v. State*, No. 08-02-00318-CR, 2004 WL 100526, at *6 (Tex.App.--El Paso Jan. 22, 2004, pet. ref'd)(not designated for publication)(same with regard to child abuse prevention posters in prosecution for indecency with a child).

As to the uniformed foreign military personal, we are unconvinced of any actual or inherent prejudice. The foreign soldiers were not obviously connected to one of the parties, nor were they brought in to influence the jury. *Cf. Powell v. State*, 897 S.W.2d 307, 318 n.7 (Tex.Crim.App. 1994)(in dicta, commenting unfavorably on atmosphere created by the single file entry into the court room of about eighty-five uniformed with mourning ribbons taped over their badges, all orchestrated by the State's attorney). In the guilt-innocence phase of the trial, the only evidence of Officer Molina's connection to the military was a single reference from another officer that Molina had returned "from deployment." It was not until the punishment phase that additional history about Officer's Molina's military service was elicited, and no claim is made that the twenty-eight foreign military officers were present during the punishment phase. The trial court also explained the presence of the foreign officers, and it unlikely the jury would have felt any pressure based on their mere presence. *See Gutierrez v. State*, 945 S.W.2d 287, 292 (Tex.App.--San Antonio 1997, no pet.)(finding no external juror influence where ten to twenty police cadets sat in the courtroom and the jury was told that the cadets were observing courtroom procedure and that they had nothing to do with the case). We overrule Issues Seven and Eight.

## CLOSING ARGUMENT

In Issue Nine, Appellant complains that the prosecutor argued an improper self-defense standard contrary to that in the jury charge. In Issue Ten, Appellant complains that the prosecutor made an improper argument on parole law. And in Issue Eleven and Twelve, Appellant contends the prosecutor improperly stated in closing argument at both phases of the trial that *three* teenagers had scratched several cars in the area.

### Standard of Review

32

The primary purpose of closing argument is to facilitate the jury's analysis of the evidence so that they reach a just and reasonable verdict based only on the evidence admitted at trial. *Campbell v. State*, 610 S.W.2d 754, 756 (Tex.Crim.App. [Panel Op.] 1980). Proper jury argument includes four areas: (1) summation of the evidence presented at trial, (2) reasonable deductions drawn from that evidence, (3) answers to the opposing counsel's argument, or (4) a plea for law enforcement. *Jackson v. State*, 17 S.W.3d 664, 673 (Tex.Crim.App. 2000), *citing McFarland v. State*, 845 S.W.2d 824, 844 (Tex.Crim.App. 1992). In determining whether a prosecutor's statements were improper, we consider the remarks in the context in which they appear, examining the "entire argument, not merely isolated sentences." *Robbins v. State*, 145 S.W.3d 306, 314-15 (Tex.App.--El Paso 2004, pet. ref'd), *citing Rodriguez v. State*, 90 S.W.3d 340, 364 (Tex.App.--El Paso 2001, pet. ref'd); *see also Gaddis v. State*, 753 S.W.2d 396, 398 (Tex.Crim.App. 1988).

Three of Appellant's issues complain that the trial court erred in failing to grant a mistrial. A mistrial is the trial court's remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex.Crim.App. 2004), *quoting Ladd v. State*, 3 S.W.3d 547, 567 (Tex.Crim.App. 1999). We review the failure to grant a mistrial based on improper jury argument for an abuse of discretion. *Hawkins*, 135 S.W.3d at 76-77. A mistrial is only appropriate for "highly prejudicial and incurable errors." *Simpson v. State*, 119 S.W.3d 262, 272 (Tex.Crim.App. 2003), *quoting Wood v. State*, 18 S.W.3d 642, 648 (Tex.Crim.App. 2000). "In reviewing a trial court's ruling on a motion for mistrial, an appellate court must uphold the trial court's ruling if it was within the zone of reasonable disagreement." *Archie v. State*, 221 S.W.3d 695, 699 (Tex.Crim.App. 2007).

In determining whether the trial court abused its discretion by denying a motion for mistrial based on an improper jury argument, we apply the so-called "*Mosley*" test, and balance the following three factors: (1) the severity of the misconduct (the prejudicial effect of the prosecutor's remarks); (2) the efficacy of any cautionary instruction by the judge; and (3) the certainty of conviction absent the misconduct. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex.Crim.App. 1998); *see also Archie*, 221 S.W.3d at 700 (noting that whether a mistrial should have been granted involves most, if not all, of the same considerations that attend a harm analysis, but is not itself a harm analysis under TEX.R.APP.P. 44.2); *Hawkins*, 135 S.W.3d at 77.

### Improper Self-Defense Standard

At three junctures in closing argument, the prosecuting attorney stated in various ways that Appellant must have had a fear for his life before his actions would be justified as self-defense.[11] Each time Appellant's counsel objected. In one instance, the trial court instructed the prosecuting attorney to rephrase her argument. On the next two occasions, the trial court sustained the objection and instructed the jury to disregard the comment. The trial court overruled two motions for mistrial based on these statements.

Appellant claims that the arguments were contrary to the law stated in the charge. The jury was charged in this case that a "person is justified in using force against another when and *to the degree* he reasonably believes the force is immediately necessary to protect himself or a third person against the other person's use or attempted use of unlawful force." [Emphasis added]. The State contends that the prosecutor's argument was proper under the charge and the evidence in the case because the jury had to consider the proportionality of Appellant's response to the

---

[11] The three statements were as follows: "When you act in self-defense, a true, genuine self-defense, you are scared for your life." "Using your reason and common sense, is that the word, the actual behavior of a person who is fearful for their life?" "That is what Medrano says the defendant is saying about this assault. Not that he was scared or in fear of his life."

threat before him. And indeed, proportionality of the response is an issue in self-defense cases. *Tidmore v. State*, 976 S.W.2d 724, 728-29 (Tex.App.--Tyler 1998, pet. ref'd)("The amount of force used must be in proportion to the force encountered."). But contrary to the assertions in the State's brief, the context of the prosecutor's statements was not made in a proportionality argument. Instead, the prosecutor was explaining the improbability of Appellant's story at trial. She was arguing that Appellant's claim that he was fearful was inconsistent with Officer Medrano telling him to leave the scene, and inconsistent with Appellant's own later statements that the officer had made him mad. In the context in which the prosecutor's statements were used, the trial court properly instructed the jury to disregard them. *Cf. Evans v. State*, No. 10-08-00319-CR, 2010 WL 376940, at *2 (Tex.App.--Waco, Feb. 3, 2010, pet. ref'd)(mem. op.)(not designated for publication)(context of similar arguments by prosecutor were in furtherance of proportionality argument and were not erroneous).

Nonetheless, we are unconvinced that the trial court erred in denying the motion for mistrial. The first factor we look to is the severity of the conduct, which by necessity inquires about its prejudicial effect. *Hawkins*, 135 S.W.3d at 77-78 ("Prejudice is clearly the touchstone of the first factor in the *Mosley* test."). Here, the context of the prosecutor's statements makes them less important to the outcome. The prosecutor was not contesting self-defense based on the level of force Appellant used but was claiming he never has any real fear to begin with. Here, the reference to "fearing for one's life" was unnecessary sophistry used to advance a different argument. The second *Mosely* factor--the efficacy of court instructions--also weighs against Appellant. Twice, the trial court *sua sponte* instructed the jury to disregard the comments. In most instances, an immediate instruction to disregard improper remarks will cure the error. *See Colburn v. State*, 966 S.W.2d 511, 520 (Tex.Crim.App. 1998)(holding that the jury is presumed

to follow the court's instructions); *Martin v. State*, 176 S.W.3d 887, 898 (Tex.App.--Fort Worth 2005, no pet.)(holding that jury is presumed to follow the instructions set forth in the trial court's charge); *Amaro v. State*, 08-14-00052-CR, 2016 WL 3344568, at *6 (Tex.App.--El Paso June 14, 2016, no pet.)(not designated for publication)(prosecutor's inadvertent misstatement that the oath was "to convict" rather than to follow "the law" was cured by instruction). We presume the jury will heed the judge's instructions, as well as follow the charge which here set out the correct standard for self-defense. *Thrift v. State*, 176 S.W.3d 221, 224 (Tex.Crim.App. 2005); *Wesbrook v. State,* 29 S.W.3d 103, 115-16 (Tex.Crim.App. 2000). And while some of the factual issues raised in this case were close, we cannot conclude these isolated and corrected statements were likely to change the outcome.

### Parole Law

Appellant also contends that the prosecutor improperly commented on parole during the punishment phase closing argument. The prosecutor first called the jury's attention to the statutorily mandated instructions on parole law as found in the charge. Appellant's immediate objection was overruled by the trial court. The prosecutor attorney then read out loud the entire charge on parole, but also added some paraphrasing comments.[12] Appellants counsel objected again. The trial court overruled the objection and told counsel to move on.

We find no error in this portion of the closing argument. The law allows counsel to quote or paraphrase the court's charge during argument. *Perez v. State*, 994 S.W.2d 233, 237 (Tex.App.--Waco 1999, no pet.). This includes paraphrasing or explaining the parole law

---

[12] The comments were as follows:

> You are allowed to know that the defendant must serve half of the sentence until the defendant is eligible for parole. Whether he gets paroled or not, you may not consider. Just because a person is eligible for parole doesn't necessarily mean they will be paroled. You are allowed to consider that they must do half of their sentence before they are eligible for parole.

36

instruction in the charge. *Id*; *Cruz v. State*, 08-14-00058-CR, 2016 WL 3194924, at *1 (Tex.App.--El Paso June 8, 2016, pet. ref'd)(not designated for publication). Appellant does not contend either that the instructions were misread, or that the paraphrasing was incorrect.

The other references to parole took place at the end of the prosecutor's closing statement. The prosecutor asked the jury to assess a sentence of at least sixty years to life, noting in the same breath "you are allowed to consider the parole law." Appellant's immediate objection was sustained, with an instruction to the jury to disregard. A motion for mistrial was also denied. The State's attorney then immediately asked the jury to reread the page of the charge containing the parol law. This request drew another sustained objection, instruction to disregard, and denied motion for mistrial. The State's attorney then asked the jury to consider all the facts and law and assess at least a sixty-year sentence. The jury assessed a fifty-year sentence.

Article 37.07 § 4(b) requires that the jury be given certain instructions that include information about parole eligibility. TEX.CODE CRIM.PROC.ANN. art. 37.07(4)(b). Consistent with that statute, the charge here stated in part that "if the defendant is sentenced to a term of imprisonment he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time he may earn." The charge also instructed the jury that it may consider the existence of the parole law and good conduct time but cannot "consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant" or "the manner in which the parole law may be applied to this particular defendant." In accord with these instructions, counsel may inform jurors about the law of parole in the abstract and ask them to take it into account in assessing punishment, but cannot make arguments regarding the manner in which

37

parole law will operate with respect to the defendant in particular. *Taylor v. State*, 233 S.W.3d 356, 359 (Tex.Crim.App. 2007); *Hawkins*, 135 S. W.3d at 84.

The prosecutor here did no more than ask the jury to consider parole and good time law as found in the charge. That charge instruction itself allows the jury to consider parole law and good conduct time in the abstract. The prosecutor never suggested any particular outcome for Appellant under the parole or good time laws. And even incidental references to the defendant when discussing parole law are not error, because the statutory instruction itself uses the words "defendant" and "he" in the text of the instruction. *Taylor,* 233 S. W.3d at 359.

Nor would any error here be harmful. Appellant's complaint is directed towards the trial court's denial of his motion for mistrial. *Hawkins*, 135 S.W.3d at 76-77 ("The only adverse ruling--and thus the only occasion for making a mistake--was the trial court's denial of the motion for mistrial."). A mistrial is the trial court's remedy for improper conduct that is "so prejudicial that expenditure of further time and expense would be wasteful and futile." *Id*. We liken the situation to that in *Taylor* where the prosecutor referenced parole eligibility in the same breath as recommending a particular sentence. *Taylor*, 233 S.W.3d at 359 ("So, why would I ask you for life and a $10,000 fine if he becomes eligible at the same point?"). The court concluded even if this was error, it was clearly harmless because the jury assessed a lesser sentence than that requested by the State. *Id*. The same is true here. Simply because that sentence was closer the State's recommended range than that suggested by Appellant does not show error. We overrule Issue Ten.

### Who Keyed the Cars

Appellant also complains that the State's attorney misstated the evidence about who keyed the cars both in the guilt innocence phase (Issue Eleven) and the punishment argument

(Issue Twelve). The trial court sustained the objection to the statements, instructed the jury to disregard, but denied motions for mistrial. Appellant's actual complaint is the denial of his motion for mistrial.

In the guilt-innocence phase, the prosecutor rhetorically suggested that Officer Molina just wanted to know why "they just scratch[ed] his car? Three guys scratching cars walking down Trowbridge." In punishment-phase closing argument, the prosecutor stated: "You have now three teenagers who are scratching cars walking down Trowbridge." After the trial court sustained an objection, the prosecutor then corrected herself, stating: "You have three teenagers walking down Trowbridge, one of them is scratching cars."

The only evidence in the case showed that Juan Gomez was the person who had scratched one or more cars. Thus the prosecutor's statement was a misstatement of the evidence in the case. Jury argument that injects facts outside the record is non-constitutional error to which we also apply the *Mosley* test. *Martinez*, 17 S.W.3d at 692, *citing Mosley,* 983 S.W.2d at 259.

Under the *Mosely* three-part test, we find the error harmless. First, the severity of the misstatement is mild. One of the youth who is clearly identified in the evidence did scratch one or more cars. Looping all three together was hyperbole. In making the statement, the prosecutor was arguing the reasonability of Officer Medrano's conduct, and not that Appellant was a bad person for scratching a car. Appellant now complains that this comment undermined his self-defense claim. But under the instructions given the jury, who scratched the car was of no legal consequence to jury's determination of that issue.[13] Whether Appellant committed the criminal

---

[13] Several of the twists and turns in the self-defense statute incorporate the concept of provocation. TEX.PENAL CODE ANN. § 9.31(a)(1)(2)(lack of provocation is necessary factor for presumption that defendant's belief that force was immediately necessary); § 9.31(b)(4)(1),(2)(provocation is exception to self-defense, subject to two sub-exceptions of its own); § 9.31(e)(lack of provocation is element of the no duty to retreat concept). The jury was not

mischief offense might be relevant to whether Officer Medrano was arresting him, and thus was in the line of duty at the time of the encounter. But the jury failed to find Appellant guilty of capital murder which also renders the relevance of that inference moot.

Appellant complains that in the punishment phase, the comment was used to enhance the sentence with another bad act. We doubt that in assessing an appropriate sentence for murder, a jury would be overly influenced by an act which might be no more than a class C misdemeanor. TEX.PENAL CODE ANN. § 28.03(b)(1). Moreover, the trial court immediately instructed the jury to disregard the statement. Although an argument that falls outside the four permissible areas is generally erroneous, it is usually cured by an instruction to disregard the argument. *Wesbrook*, 29 S.W.3d at 115; *Weatherby v. State*, 61 S.W.3d 733, 737 (Tex.App.--Fort Worth 2001, pet. ref'd); *Shannon v. State*, 942 S.W.2d 591, 597 (Tex.Crim.App. 1996). Additionally, the prosecutor promptly corrected her own misstatement of the record. *See Hawkins*, 135 S.W.3d at 77 (finding error harmless based, in part, on prosecutor's retraction of the comment made during argument).

While the third *Mosely* factor may weight somewhat on Appellant's side of the ledger, we conclude the isolated misstatement about who scratched the car was harmless in light of the entire record. We therefore overrule Issues Eleven and Twelve.

## CUMMULATIVE ERROR

Finally, in Issue Fifteen, Appellant claims the cumulating effect of the above errors requires reversal.

Multiple errors may be harmful in their cumulating effect on the defense even if each error would be harmless standing on its own. *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex.Crim.App. 1999), *cert. denied*, 528 U.S. 1082, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000)(but

charged on any of these provisions in Section 9.31 and provocation was simply not an issue in this case.

40

also explaining that unless and until multiple errors are found to have been committed, there can be no cumulative error effect because non-errors cannot in their cumulative effect create harmful error). The mere existence of multiple errors, however, does not warrant reversal unless they operate in concert to undermine the fundamental fairness of the proceedings. *Estrada v. State*, 313 S.W.3d 274, 311 (Tex.Crim.App. 2010); *see also Murphy v. State*, 112 S.W.3d 592, 607 (Tex.Crim.App. 2003)("Because we have found little or no error in the above-alleged points, there is no harm or not enough harm to accumulate."). If the individual claims of error lack merit, then there is no possibility of cumulative error. *Gamboa v. State*, 296 S.W.3d 574, 585 (Tex.Crim.App. 2009); *Chamberlain*, 998 S.W.2d at 238.

Appellant relies on *Lopez v. State*, 705 S.W.2d 296, 298 (Tex.App.--San Antonio 1986, no pet.) for the proposition that the cumulative effect of the State's improper jury argument can form the basis for reversal. Texas courts of appeals have since recognized that the *Lopez* cumulative error threshold is satisfied where the record reflects that the State repeatedly exceeded the bounds of acceptable jury argument and ignored the trial court's rulings. *McCarthy v. State*, No. 01-12-00240-CR, 2013 WL 5521926, at *12 (Tex.App.--Houston [1st Dist.] Oct. 3, 2013, no pet.)(not designated for publication); *Grant v. State*, 738 S.W.2d 309, 311 (Tex.App.--Houston [1st Dist.] 1987, pet. ref'd). But as we previously discussed, the State's arguments were either not improper, or for those which were improper, they fail to rise to the standard for cumulative error. We overrule Issue Fifteen.

**CONCLUSION**

In the prior appeal, we resolved Issue Four, Thirteen, and Fourteen. Today, we overrule the challenge to the limit on voir dire (Issue One), the remaining legal sufficiency challenges

(Issue Two and Three), the charge objections (Issues Five and Six), the outside influence claims (Issues Seven and Eight), the jury argument claims (Issues Nine, Ten, Eleven, and Twelve), and the cumulative error claim (Issue Fifteen).  The judgment of conviction is affirmed.

April 10, 2019
ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.
Rodriguez, J. (Dissenting)

(Do Not Publish)